# Illinois Official Reports

## Appellate Court

---

### *In re Detention of White*, 2016 IL App (1st) 151187

---

| | |
|---|---|
| Appellate Court Caption | *In re* THE DETENTION OF PHILLIP WHITE (The People of the State of Illinois, Petitioner-Appellee, v. Phillip White, Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-1187 |
| Filed | September 16, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-80003; the Hon. Thomas Byrne, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Office of Stephen F. Potts, of Des Plaines (Stephen F. Potts, of counsel), for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, Michael M. Glick and Evan B. Elsner, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Justice Reyes concurred in the judgment and opinion.<br>Presiding Justice Gordon specially concurred, with opinion. |

**OPINION**

¶ 1        Respondent Phillip White, who previously had been convicted of sexually violent offenses, was found by a jury to be a sexually violent person and committed to the Illinois Department of Human Services (IDHS). On appeal, White argues (1) his commitment was improper because the diagnosis by the State's experts of other specified personality disorder with antisocial features did not qualify as a mental disorder pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2014)), (2) the trial court erroneously rejected his proposed special interrogatory and thereby deprived him of the opportunity to test the jury's general verdict, and (3) the State failed to prove beyond a reasonable doubt that he was a sexually violent person where he had not manifested any symptoms of the alleged mental disorder for 30 years.

¶ 2        For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                I. BACKGROUND

¶ 4        This appeal arises from White's jury trial, which found him to be a sexually violent person under the Act and committed him to the IDHS for control, care, and treatment in a secure facility until such time as he was no longer a sexually violent person. The experts who testified at the trial used White's documented history of criminal convictions in 1980, 1985, and 1991 in formulating their opinions.

¶ 5        Specifically, in April 1980, White pled guilty to attempted rape, armed robbery, and aggravated battery. According to the record, he followed a woman off an elevated train, grabbed her around her throat, hit her several times, and dragged her into an alley. He said, "you know what I want b***," tore off her pants and panties, and attempted to place his penis into her vagina. The police arrived and caught White as he fled the scene.

¶ 6        In September 1985, White pled guilty to aggravated criminal sexual assault. At the time of the assault, he was on parole for the 1980 offenses for approximately one year. According to the record, White and a female acquaintance were walking in a park, and White asked her to join him as he picked up a package. They went together to an apartment building, but no one answered the door upon their arrival. They went downstairs to the basement, and White tried to kiss the woman, but she refused his advances. White then grabbed her by the neck, choked her, hit her, cut her lip, and forced her into the basement. He told her, "I'm going to give you something to believe [the gossip about me being a rapist]," and then he undressed her and raped her.

¶ 7        In September 1991, White was convicted after a bench trial of armed robbery. At the time of this robbery, he was on parole for the 1985 sexual assault offense for approximately one year. According to the record, White followed a woman and her six-year-old daughter off a bus. When they approached an alley, White took out a knife and pressed it to the woman's throat. He took her purse and then proceeded to drag her into the alley. He fled when bystanders intervened and was later arrested. He received a 35-year sentence for this offense.

¶ 8        During his incarceration, he had some minor disciplinary issues and received "tickets," although never for sexual violations. In 1993, he was found to have two dagger-like weapons in his possession at the Illinois Department of Corrections (IDOC). He pled guilty to unlawful

use of a weapon by a person in the custody of the IDOC and was sentenced to six years' imprisonment, to be added to his 35-year sentence for the armed robbery offense.

¶ 9    In February 2012, the State petitioned to commit White as a sexually violent person under the Act on the basis of two mental disorders: paraphilia, not otherwise specified, nonconsenting persons, and personality disorder, not otherwise specified, with antisocial features. White's diagnosis at that time was based on the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM). In July 2014, the State amended its petition, revising the alleged mental disorders to reflect the updated wording of the fifth edition of the DSM (DSM-5) for the alleged disorders, *i.e.*, other specified paraphilic disorder, nonconsenting females in a controlled environment (hereinafter os-paraphilic disorder, nonconsenting females), and other specified personality disorder with antisocial features (hereinafter os-antisocial personality disorder).

¶ 10   In February 2015, a jury trial was held on the State's petition to commit White as a sexually violent person. Expert testimony established that the Act defined a mental disorder as a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence. See 725 ILCS 207/5(b) (West 2014).

¶ 11   The expert testimony established that the term paraphilia denoted any intense and persistent sexual interest other than sexual interest in genital stimulation or prepatory fondling with a phenotypically normal, physically mature consenting human partner. Paraphilia could be focused on a particular object of desire, like nonconsenting women in this case. A paraphilic disorder was a paraphilia that caused distress or impairment to the individual or the satisfaction of which entailed personal harm or risk of harm to others. The category other specified paraphilic disorder applied to presentations of a paraphilic disorder that caused distress or impairment in a person's functioning, but did not meet the specific criteria for any of the eight disorders that were outlined in the DSM-5. The DSM-5's criteria for a diagnosis of other specified paraphilic disorder, nonconsenting females in a controlled environment, required an individual to have recurrent intense sexually arousing fantasies, urges, or behaviors involving nonconsenting persons that impaired the individual's life over a period of at least six months. Here, the term controlled environment referred to White's incarceration in the IDOC and whether the opportunities for his alleged paraphilic behavior to manifest itself were unavailable to him.

¶ 12   According to the expert testimony concerning the DSM-5 diagnosis of os-antisocial personality disorder, the features indicative of a personality disorder predominate but do not meet the specific criteria of any of the personality disorders outlined in the DSM-5. A personality disorder affects an individual's characteristic way of thinking, managing his emotions, interacting with other people, or managing impulses. The term antisocial features meant the individual was willing to disregard the rights of others, violate rules, and social norms and continue to engage in criminal behaviors even after being sanctioned or incarcerated. Features indicative of this diagnosis include habitual criminal activities, violence, aggressiveness, and failure to take responsibility or demonstrate any remorse, empathy, or concern for the harm caused.

¶ 13   The State's evidence consisted of two expert witnesses in the area of forensic and clinical psychology, Drs. Allison Schechter and Edward Smith. Both doctors specialized in sex offender evaluations, had conducted a sex offender evaluation of White for the IDOC, and were qualified as experts in the areas of sex offender evaluation and risk assessment. They had

reviewed documents from White's IDOC master file, which included police reports, witness reports, court documents, medical records, documents concerning White's disciplinary history, and other records. They also had reviewed White's criminal convictions from 1980, 1985, and 1991 and used that information to formulate their opinions. Although evaluators were required to ask the subject of the evaluation for an interview, such interviews were not necessary to make a diagnosis, and an evaluation based on the subject's records only was complete and widely accepted when the subject chose not to participate in an interview. Drs. Schechter and Smith attempted to conduct clinical interviews with White, but he chose not to participate.

¶ 14     Dr. Schechter was a psychologist employed by Wexford Health Source, Inc., a private company that provided evaluation services for the IDOC. Although her 2012 report had been based on the fourth edition of the DSM, she updated that report in February 2014 using the DSM-5. She opined that White met the statutory criteria to be found a sexually violent person. She concluded, based on the facts of White's 1980 and 1985 convictions, that he suffered from both os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder. Furthermore, he had a girlfriend at the time of his 1980 and 1985 offenses and, thus, presumably had a consensual sexual outlet available to him. This indicated that White had a desire for sexual activity with nonconsenting women despite the availability of a consensual partner. Moreover, White was on parole for less than one year at the time of his 1985 offense, which suggested an inability to control his behavior. Dr. Schechter opined that White's convictions showed recurring and intense sexual arousal for a period of at least six months.

¶ 15     Dr. Schechter also considered White's 1991 armed robbery conviction in reaching her diagnoses. At the time of this robbery, White was on parole for about one year following the 1985 sex offense. Although the 1991 robbery was not a sexually violent offense for purposes of the Act, Dr. Schechter believed it was relevant to her diagnoses because it followed White's pattern of abducting an essentially lone woman in public and taking her to an isolated second location where he struggled with the victim. Because a witness had intervened in the 1991 incident, it was unknown whether it would have resulted in a sexual assault. According to Dr. Schechter, this pattern of behavior was consistent with the diagnoses of os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder. Dr. Schechter also opined that White's 1993 conviction for unlawful possession of a weapon in the IDOC was a further indication of his antisocial personality tendencies, *i.e.*, difficulty complying with rules even in a controlled environment like prison.

¶ 16     Dr. Schechter testified that both os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder were congenital or acquired conditions that affected White's emotional or volitional capacity and predisposed him to commit future acts of sexual violence. A paraphilic disorder could be considered in remission if a person shows that he could be in the community for at least five years without demonstrating any of the associated behaviors. White's condition, however, could not be considered in remission because, regardless of his behavior while incarcerated, he was never out of prison for more than one year before reoffending. Dr. Schechter testified that her diagnoses for White of both os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder were mental disorders as defined by the Act.

¶ 17     On cross-examination, Dr. Schechter acknowledged that a diagnosis under the DSM-5 was not necessarily a mental disorder as defined by the Act. Further, she testified:

"Q. Is it your conclusion that the personality disorder you diagnosed in this case alone would be a mental disorder as defined by the [Act] or not?

A. Alone without the paraphilic disorder?

Q. Right.

A. If I had done an evaluation on a person that I only diagnosed with the personality disorder, I would not likely refer them for commitment.

Q. So is it fair to say that if somebody didn't find Mr. White suffered from other specified paraphilic disorder, that the personality disorder which you diagnosed him with would not be a mental disorder as defined by the [Act]?

A. That diagnosis alone, I would not refer somebody for commitment based on that diagnosis alone, no."

On redirect examination, Dr. Schechter testified:

"Q. You diagnosed [White] with two mental disorders, correct?

A. Yes.

Q. They are both the mental disorders required for commitment pursuant to the [Act]?

A. Yes. Both of those mental disorders I used as pursuant to the [Act]."

¶ 18 Dr. Smith was a psychologist employed by the IDHS. He had updated his 2012 evaluation of White to reflect the new DSM-5 nomenclature for White's diagnoses of both os-paraphilic disorder, nonconsenting females, nonexclusive type in a controlled environment, and os-antisocial personality disorder. Dr. Smith testified that the term nonexclusive type meant the individual was not solely sexually aroused by nonconsenting individuals. Like Dr. Schechter, Dr. Smith based those two diagnoses partly on the facts and circumstances of White's history of criminal convictions. Specifically, Dr. Smith diagnosed White with os-paraphilic disorder, nonconsenting females, based on his behavior and the sexual statements he made to the victims while attempting to sexually assault them. Dr. Smith found it significant that White was able to maintain arousal throughout the 1985 sexual assault until completion, indicating an intense sexual interest in a nonconsenting partner. The 1991 offense was very similar to White's behaviors in the 1980 and 1985 sexual offenses, and the 1993 weapon conviction was relevant to demonstrate White's overall pattern of criminal attitudes and behaviors and willingness to break rules even when confined in the IDOC.

¶ 19 Dr. Smith diagnosed White with os-antisocial personality disorder because he had repeatedly targeted lone women, attempted to isolate them, and used force to harm or threaten them. The diagnoses of os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder were congenital or acquired conditions and worked synergistically to cause White to sexually offend. Dr. Smith explained that the two disorders worked together to affect White's emotional or volitional capacity because when an individual was sexually aroused from sexual behavior with nonconsenting persons and possessed an attitude toward other people that made him more willing to violate the rights of others, the two disorders made the risk of offense more likely.

¶ 20 On cross-examination, Dr. Smith acknowledged that someone could have a DSM-5 diagnosis but still not meet the criteria to be deemed a sexually violent person under the Act. Dr. Smith also testified:

"Q. You talked about the synergy between the personality disorder and the other specified paraphilic disorder, right?

A. Yes.

Q. But the personality disorder alone in and of itself is not a mental disorder as defined by the [Act], isn't that your opinion?

A. Typically, correct.

Q. In fact, you would not find that in this case?

A. Correct."

On redirect, Dr. Smith testified:

"Q. You indicated that otherwise specified personality disorder with antisocial traits would not in this case be a standalone diagnosis under the [Act]?

A. Correct.

Q. You diagnosed him in conjunction with other specified paraphilic disorder?

A. Correct.

Q. Is it then when they are together, is it then are they both mental disorders as defined by the Act?

A. Yes."

¶ 21    Drs. Schechter and Smith both testified that the os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder were considered chronic in nature, would not disappear or decrease with the passage of time, and had to be managed through cognitive behavioral therapy. Because these disorders typically manifested as behaviors outside of a controlled environment, the fact that White did not commit any sexual offenses while incarcerated was not proof that he no longer suffered from either mental disorder. Paraphilic disorders could be treated through therapy, but White had not participated in any sex offender treatment.

¶ 22    Both experts conducted a risk assessment of White to determine his risk to reoffend sexually if released. As a starting point for their assessments, they used actuarial instruments that were comprised of a number of known static or historical risk factors related to sex offender recidivism. The subject of the assessment was scored based on those objective factors and then placed in a risk category. This risk category was not meant to calculate any specific subject's possibility of reoffending but rather was simply a comparison, within a standard measure of error, to a range of a known group of sex offenders. The experts also considered dynamic risk and protective factors that were additional empirically derived factors that had been shown through research to either increase or decrease a subject's risk of future reoffense.

¶ 23    Dr. Schechter used the Static-99R and MnSOST-R in her evaluation. However, because the MnSOST-R was no longer widely used at the time of trial, she had reduced its weight in her overall evaluation of White. Although Dr. Schechter initially gave White a score of five on the Static-99R with an estimated recidivism rate of 21.2%, she later revised that score to a seven upon realizing she had mistakenly used White's 1991 armed robbery conviction as his most recent sexual offense instead of his 1985 aggravated sexual assault. She explained that she should have factored into his score his 34 years of age at the time of his possible release from his sex offense. A score of seven was considered to be in the high risk category, with an estimated recidivism rate of 30.7%. The standard measurement of error for the Static-99R was

0.89, meaning a given score could be expected to fall within a range of 0.89 above or below the given score.

¶ 24    Dr. Schechter also considered dynamic risk factors in formulating her opinion, such as White's general criminality or lifestyle instability, intimacy deficits, sexual self-regulation, cooperation with supervision, and diagnosed personality disorder. She found that White had been incarcerated for all but two years of his adult life and had committed very serious offenses while on parole and in the community for a very short interval. This showed an inability to cooperate with community supervision. She also found that the violent and callous behavior White demonstrated while committing his offenses showed a lack of capacity for self-regulation and a general lack of concern for others. Furthermore, White's report to previous evaluators that he had approximately 50 consensual sexual partners in the past and was unfaithful to many of them demonstrated a lack of capacity to form an intimate relationship. A previous evaluator had been told by White that he would not participate in sex offender treatment even if it was mandated as a condition of his parole.

¶ 25    Dr. Smith used the Static-99R and the Static-2002R to conduct his risk assessment of White. Dr. Smith gave White a score of five on the Static-99R, which placed him in the moderate high risk category for future offenses. White had a score of six on the Static-2002R, which placed him in the moderate risk category of that instrument. Dr. Smith also considered the additional factors of personality disorder, paraphilic interest, a history of employment instability, substance abuse, and noncompliance with supervision. Dr. Smith opined that White's relationship history, which included being married for a period of time, demonstrated he could recognize deviant sexual interest and still chose to repeatedly engage in criminal behaviors even though he could find consensual partners.

¶ 26    Both Drs. Schechter and Smith concluded that none of the protective factors that potentially could have lowered White's risk of sexual offense recidivism applied to him. White had never participated in sex offender treatment, had no debilitating medical conditions that interfered with his ability to achieve arousal or commit crimes, and his age of 53 years was not significantly old enough to reduce his risk to commit further sexual offenses. Both experts concluded that White continued to suffer from both paraphilic and personality disorders because he had not participated in cognitive behavioral treatment, had not been in the community for five years without reoffending, and had not satisfied any of the other criteria that would indicate his disorders were in remission. Drs. Schechter and Smith opined that White's risk of reoffending was substantially probable, meaning he would be much more likely than not to commit acts of sexual violence in the future. Drs. Schechter and Smith opined that White met all the criteria to be designated a sexually violent person.

¶ 27    Dr. Romita Sillitti, a Du Page County psychologist, testified for White as an expert in the field of sex offender evaluation and risk assessment. She concluded that White did not meet the criteria of a sexually violent person and was not substantially probable to reoffend. Dr. Sillitti reviewed White's IDOC master file and the reports of Drs. Schechter and Smith. Dr. Sillitti also conducted a 3½-hour interview with White. She found no evidence of severe mental illness. Based upon White's assertion to Dr. Sillitti that he was "drunk" at the time of the 1980 offense, Dr. Sillitti made a provisional diagnosis of substance abuse disorder. She acknowledged, however, that the evidence was insufficient to make a substance abuse disorder diagnosis due to the inaccessibility of alcohol or narcotics in the controlled environment of the IDOC.

¶ 28    Dr. Sillitti stated there was no clear evidence that the nonconsensual aspect of White's offenses aroused him and thus concluded that the evidence did not support a diagnosis of os-paraphilic disorder, nonconsenting females. Based on White's criminal history, Dr. Sillitti believed he was motivated in the 1980 offense by intoxication and in the 1985 offense by anger that the victim had rebuffed his initial advances. Dr. Sillitti believed that White's 1991 robbery offense was at least in part motivated by greed for material goods because he had taken the victim's purse.

¶ 29    Dr. Sillitti noted that White had not been diagnosed with os-paraphilic disorder, nonconsenting females, until the State's experts conducted their evaluations in the instant case. Dr. Sillitti also emphasized that White had not committed any sexual offenses during his decades of incarceration in the IDOC. Dr. Sillitti opined that even if someone had a paraphilic desire in a controlled environment like the IDOC, that person would demonstrate behaviors like making sexual statements, sexual misconduct, or possession of pornography.

¶ 30    Dr. Sillitti diagnosed White with os-antisocial personality disorder. She explained that a personality disorder was the pervasive, stable way a person thought, felt, and acted in the world and antisocial personality disorder in particular was a pervasive disregard for basic human rights and norms. White did not meet the full criteria of an antisocial personality disorder because he did not have any history of significant juvenile delinquent behavior even though he showed other characteristics of the personality disorder, like criminal convictions. Dr. Sillitti stated that a personality disorder was not a mental disorder as defined by the Act because it did not affect a person's emotional or volitional capacity, it did not cause changes in the person's mood that were beyond the person's control, and it did not change the person's ability to understand reality or discern right from wrong. She did, however, testify that someone with an antisocial personality disorder was more likely to commit a crime than someone without the personality disorder.

¶ 31    Dr. Sillitti used the Static-99R and Static-2002R in her risk assessment of White. She gave him a score of four or five on the Static-99R. That range resulted from variations concerning the risk factor of whether the subject had targeted a known person or a stranger. Specifically, White had told Dr. Sillitti that the victim in the 1980 offense was someone in his building and known to him, but the victim did not tell the police that she knew White. If the victim was a stranger, then White's risk score was a five. If the victim was a known person, then White's risk score was a four. Dr. Sillitti testified that White scored a six on the Static-2002R, which placed him in the moderate range.

¶ 32    Dr. Sillitti conceded that White did present with some dynamic risk factors, such as an antisocial lifestyle, inconsistent jobs, substance abuse, and problems with self-regulation or compliance with supervision. She also testified that it was a risk factor for reoffense if a subject was unable to see himself as a risk and White had told her during their interview that he did not see himself as a risk. Dr. Sillitti stated, however, that although the dynamic risk factors were associated with a predisposition to break the law, these factors did not necessarily indicate a risk of sexual recidivism.

¶ 33    Concerning mitigation factors, Dr. Sillitti opined that White's 53 years of age decreased somewhat his risk to engage in acts of sexual violence. Dr. Sillitti did not believe White's lack of participation in sex offender treatment was troublesome because she did not think he suffered from a deviant sexual interest. She ultimately opined that White was not substantially probable to reoffend and was not a sexually violent person.

¶ 34    On cross-examination, Dr. Sillitti acknowledged certain inconsistencies between White's account of his 1980 offense and the facts contained in the police documents and court record. Specifically, the only information suggesting that White had an alcohol problem was White's 2013 statement to Dr. Sillitti that he was "stupid drunk" at the time of the 1980 offense. Moreover, Dr. Sillitti acknowledged that a diagnosis based on recurrent sexual fantasies depended primarily on self-reporting and it was not uncommon for someone to deny rape fantasies during a clinical interview. Concerning Dr. Sillitti's reliance on the fact that White took the 1991 victim's purse as an indication that the robbery was not sexually motivated, Dr. Sillitti acknowledged that the record showed White continued to drag the woman into an alley at knife-point even after he had taken her purse. Dr. Sillitti also acknowledged that White had not participated in either substance abuse or anger management treatment even though those options had been available to him.

¶ 35    At the jury instruction conference, White's counsel asked the court to submit several special interrogatories to the jury. Special interrogatory No. 2, which is at issue here on appeal, stated, "We the jury find the Respondent, Phillip White, suffers from the mental disorder other specified paraphilic disorder nonconsent." The State objected to this special interrogatory on the grounds that it misleadingly referred to only one of the two mental disorders from which White suffered, according to the testimony of the State's experts. The trial court refused to give any of White's proposed special interrogatories.

¶ 36    During closing argument, the State argued, *inter alia*, that it met its burden to prove White suffered from a mental disorder because both Drs. Schechter and Smith had testified that the two disorders of os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder, in conjunction, were mental disorders under the Act. White's paraphilic disorder drove his deviant sexual behavior, and his antisocial personality disorder showed that he did not care about the rights or safety of others, and "those two things, when they work together, are the mental disorders pursuant to the Act."

¶ 37    During deliberations, the jury sent the court a note that asked, "Is the qualifying mental disorder that we're basing our decision on paraphilic non-consent." The court instructed the jury to refer to the instructions and continue to deliberate. Thereafter, the jury found that White was a sexually violent person, and he was committed to the IDHS in April 2015. He timely appealed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, White challenges the trial court's indefinite involuntary commitment order entered after a jury found that he was a sexually violent person under the Act. White contends (1) his adjudication as a sexually violent person and involuntary commitment were improper because the diagnosis by the State's experts of the antisocial personality disorder did not qualify as a mental disorder under the Act, (2) the trial court erred by refusing to give White's special interrogatory to the jury, and (3) the State failed to prove beyond a reasonable doubt that he was a sexually violent person.

¶ 40                       A. Mental Disorder Requirement of the Act

¶ 41    White contends he is entitled to a new trial because the State was erroneously allowed to seek his commitment based on an os-antisocial personality disorder diagnosis despite the lack of any testimony that an antisocial personality disorder alone could constitute a mental

disorder as defined by the Act. White states that although both of the State's experts opined that White's two diagnoses—os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder—worked together to cause him to reoffend, they conceded, when pressed on cross-examination, that an antisocial personality disorder alone was not a mental disorder as defined by the Act. White argues that because the State's experts did not find the os-antisocial personality disorder to be a mental disorder independent of the os-paraphilic disorder, nonconsenting females, it was manifest error to subject White to the possibility of being committed based on something other than os-paraphilic disorder, nonconsenting females.

¶ 42 Some controversy surrounds the use of an antisocial personality diagnosis to establish a mental disorder as a basis of involuntary commitment as a sexually violent person. See *McGee v. Bartow*, 593 F.3d 556, 563 (7th Cir. 2010) (discussion of Supreme Court cases involving the issue of whether a personality disorder diagnosis, without more, could satisfy the requirement of a mental condition that causes a lack of control); *In re State*, 21 N.E.3d 239, 249-50 (N.Y. 2014) (holding that antisocial personality disorder was not a mental disorder under a New York statute concerning the involuntary commitment of sexually violent persons); *In re Commitment of Adams*, 588 N.W.2d 336, 340 (Wis. Ct. App. 1998) (interpreting the term *mental disorder* in the Wisconsin statute concerning sexually violent persons to encompass personality disorders). Such controversy notwithstanding,

> "the factfinder has the ultimate responsibility to assess how probative a particular diagnosis is on the *legal* question of the existence of a "mental disorder"; the status of the diagnosis among mental health professionals is only a step on the way to that ultimate legal determination. The methodology and the outcome of any mental health evaluation offered as evidence is a proper subject for cross-examination, and we would expect that, in the ordinary case, such efforts would expose the strengths and weaknesses of the professional medical opinions offered." (Emphasis in original.) *McGee*, 593 F.3d at 577.

¶ 43 White's attempt, however, to place his appeal within the controversy concerning the use of the antisocial personality disorder in commitment proceedings is unavailing. The record here clearly establishes that both State experts testified that White's two disorders of os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder, in conjunction, constituted a condition or conditions that met the Act's definition of a mental disorder. Specifically, White's paraphilic disorder drove his deviant sexual behavior and his antisocial personality disorder showed that he did not care about the rights or safety of others, and those two DSM-5 disorders, when they worked together, constituted conditions that were mental disorders pursuant to the Act. Both State experts acknowledged that White's personality disorder diagnosis alone would not constitute a mental disorder as defined by the Act. The testimony and argument before the jury clearly explained that a diagnosis of a mental disorder under the DSM-5 was not necessarily a mental disorder as defined by the Act. Consequently, White's assertion that his involuntary commitment could be based solely upon a personality disorder, which does not cause a lack of control, lacks merit.

¶ 44 Without citation to any relevant authority, White seems to complain that a combination of psychological conditions, like the paraphilic and personality disorders here, should not qualify as a mental disorder under the Act. To the extent that we are called upon to interpret the Act in ruling upon this issue, that question is one of law, which is subject to a *de novo* standard of review on appeal. *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 36.

¶ 45    The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Dabbs*, 239 Ill. 2d 277, 287 (2010). The most reliable indicator of that intent is the plain and ordinary meaning of the language of the statute itself. *Id.* In determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting the statute. *Id.* If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *Id.* A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007).

¶ 46    A petition under the Act must allege, among other things, that the respondent "has a mental disorder" and "is dangerous to others because [his or her] mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." 725 ILCS 207/15(b)(4), (5) (West 2014). The Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2014). The plain language of the Act requires the existence of only one "condition" and does not exclude any specific psychological condition from this definition. Moreover, there is no indication in the plain language of the Act that the term *condition* must refer to a single DSM-5 disorder that must, standing alone, qualify as a mental disorder as defined under the Act. To require the term *condition* under the Act to mean only psychological diagnoses that each alone or independently would be enough to qualify a person as suffering a mental disorder as defined by the Act would be to read a condition into the Act that the legislature did not expressly set forth and would ignore the expert testimony presented in this case that White's os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder worked synergistically to constitute mental disorders under the Act. Because we will not read any such limitation or condition into the plain language of the Act, we reject White's argument, which seeks to limit the term *condition* in the Act's definition of a mental disorder to single, standalone disorders as defined in the DSM-5.

¶ 47    We conclude that the evidence here concerning White's os-paraphilic, nonconsenting females, disorder in conjunction with his os-antisocial personality disorder, which worked synergistically and affected his emotional or volitional capacity to predispose him to engage in acts of sexual violence, may suffice to constitute a condition pursuant to the Act's definition of a mental disorder. The Supreme Court has acknowledged that courts utilize an imprecise definition of a serious mental disorder rather than precise bright-line rules when the courts are engaged in distinguishing a dangerous sexual offender subject to civil commitment from other dangerous persons who may be more properly dealt with exclusively through criminal proceedings. *Kansas v. Crane*, 534 U.S. 407, 413 (2002). This is so because courts must respect the considerable leeway states possess in defining the conditions that make individuals eligible for commitment and "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." *Id.* We address separately below White's challenge to the sufficiency of the evidence to support his adjudication and commitment as a sexually violent person.

¶ 48    White also argues that, as a matter of law, an individual cannot be subject to involuntary commitment under the Act based on a personality disorder because personality disorders do

not predispose individuals to acts of sexual violence and compel them to act out sexually. The pleadings, trial testimony, and argument before the jury, as set forth in detail above, establish that White was not committed under the Act on the basis of a personality disorder alone; the record clearly establishes that Drs. Schechter and Smith diagnosed White with two DSM-5 disorders and opined that both disorders worked together to constitute, under the Act, a condition that affected White's emotional or volitional capacity that predisposed him to engage in acts of sexual violence. Accordingly, we decline White's invitation to issue an advisory opinion on the issue of whether a DSM-5 personality disorder diagnosis alone may constitute a mental disorder under the Act. See *In re Chilean D.*, 304 Ill. App. 3d 580, 584 (1999) (this court may not issue advisory opinions that are contingent upon the possible happening of a future event).

¶ 49                                  B. Special Interrogatories

¶ 50    White asserts the trial court's refusal to submit his special interrogatory No. 2 to the jury was clear error and grounds for reversal because his request that the jury make a finding on whether he suffered from os-paraphilic disorder, nonconsenting females, was designed to test the jury's general verdict. He contends he could not have been committed if the jury had answered his special interrogatory in the negative because there was no evidence establishing that other conditions aside from os-paraphilic disorder, nonconsenting females, constituted the necessary element of a mental disorder.

¶ 51    Proceedings involving the adjudication of individuals as sexually violent persons are civil in nature. 725 ILCS 207/20 (West 2014). The Code of Civil Procedure (Code) provides that juries render general verdicts unless the nature of the case requires otherwise. 735 ILCS 5/2-1108 (West 2014). The Code also provides that parties may request the jury to make special findings upon any material question or questions of fact. *Id.* A trial court's decision on whether to give a special interrogatory that has been requested by a party is reviewed as a question of law *de novo*. *Id.*; *In re Detention of Hayes*, 2014 IL App (1st) 120364, ¶ 38.

¶ 52    A special interrogatory is proper if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend and (2) an answer responsive thereto is inconsistent with a general verdict that might be returned. *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). A response to a special interrogatory is inconsistent with a general verdict only where it is " 'clearly and absolutely irreconcilable with the general verdict.' " *Id.* at 555-56 (quoting *Powell v. State Farm Fire & Casualty Co.*, 243 Ill. App. 3d 577, 581 (1993)). An interrogatory should be a single direct question and should not be misleading, confusing, or ambiguous. *Zois v. Piniarski*, 107 Ill. App. 3d 651, 652 (1982). "[A]n inconsistent special finding controls a general verdict as a matter of common law ***." *Id.*

¶ 53    White's proposed special interrogatory No. 2 stated, "We the jury find the Respondent, Phillip White, suffers from the mental disorder Other Specified Paraphilic Disorder Non-consent." Although White's expert opined that he could be diagnosed solely with os-antisocial personality disorder, both the State's witnesses testified that White had two diagnoses—os-paraphilic disorder, nonconsenting females, and os-antisocial personality disorder—and those two disorders worked in conjunction to constitute a condition or conditions that met the definition of a mental disorder as defined by the Act. White's proposed special interrogatory listed a single mental disorder: os-paraphilic disorder, nonconsenting females. But the State presented evidence of two mental disorders working together to drive

- 12 -

his deviant sexual behavior and disregard for the rights or safety of others and thereby satisfying the requirements of the Act. Accordingly, White's proposed special interrogatory was incomplete and confusing and could have misled the jury to think it could consider only the os-paraphilic disorder, nonconsenting females, standing alone, as a mental disorder and basis for commitment under the Act. Moreover, a negative answer to the proposed special interrogatory would not have been absolutely irreconcilable with a general verdict because the State's experts testified that White's two diagnoses worked synergistically to meet the mental disorder definition. See *In re Detention of Hayes*, 2014 IL App (1st) 120364, ¶ 42 (trial court properly rejected an incomplete interrogatory that listed a single mental disorder—paraphilia, not otherwise specified, nonconsent (PNOS)—but the State had presented testimony that the respondent suffered from both PNOS and antisocial personality disorder and both diagnoses, alone or together, were sufficient to qualify him as a sexually violent person under the Act). Based on the evidence presented at the hearing in this case concerning White's two synergistic mental disorders, White's proposed special interrogatory would have painted an improper picture to the jury, and the trial court correctly refused it.

¶ 54                              C. Sufficiency of the Evidence

¶ 55        White asserts the State failed to prove beyond a reasonable doubt that he suffered from a mental disorder as defined by the Act because the State's case relied solely on the fact that he was convicted of prior sex offenses and the evidence failed to show that in the past 30 years he had manifested any symptoms, behaviors, or conduct evidencing a mental disorder. Specifically, White argues that none of his IDOC infractions were sexual in nature and if he was driven by strong desires for nonconsenting sex, he potentially had opportunities to act out sexually while incarcerated but did not do so.

¶ 56        When addressing a challenge to the sufficiency of the evidence in a sexually violent person adjudication proceeding, the reviewing court views the evidence in a light most favorable to the State and determines whether any rational trier of fact could have found the required elements proven beyond a reasonable doubt. *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 48. A reviewing court will not reverse a jury's sexually violent person determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Id.*; *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). It is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602-03 (2007).

¶ 57        The Act mandates procedures by which the State can involuntarily commit individuals found by a court or jury to be a sexually violent person. 725 ILCS 207/40(a) (West 2014). A sexually violent person is a person who has been convicted of a sexually violent offense, suffers from a mental disorder, and is dangerous because his mental disorder creates a substantial probability that he will engage in acts of sexual violence. 725 ILCS 207/15(b) (West 2014); *In re Detention of Hardin*, 238 Ill. 2d 33, 43 (2010). The Act requires the existence of only one condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence (*In re Detention of Welsh*, 393 Ill. App. 3d 431, 457 (2009)), and as discussed above, nothing in the plain language of the Act prohibits a commitment from being based on a combination of conditions that make it substantially probable that the person will engage in acts of sexual violence.

¶ 58    White does not challenge the first element: that he has been convicted of a sexually violent offense. White argues that the evidence was not sufficient to prove beyond a reasonable doubt both the mental disorder and substantial probability elements. White argues that he had never been diagnosed with os-paraphilic disorder, nonconsenting females, before his evaluation under the petition at issue here. White cites section 35(e) of the Act, which states that "[e]vidence that a person who is the subject of a petition under *** this Act was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder." 725 ILCS 207/35(e) (West 2014). White claims the State's case relied solely on the fact that he was convicted of prior sex offenses. White also argues there was no evidence of any conduct or behavior in the last 30 years to establish that he currently suffered from paraphilia. We disagree.

¶ 59    While a prior sexually violent offense is not sufficient to establish that a person has a mental disorder, experts are not prohibited from relying on the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder. *Hardin*, 238 Ill. 2d at 51. Here, the State's experts relied on the details of White's offenses, not the mere existence of the offenses, to make their diagnoses. Drs. Schechter and Smith both focused on the pattern demonstrated by White's criminal behavior. The parallel aspects of his 1980, 1985, and 1991 offenses suggested a pattern of behavior consistent with a mental disorder diagnosis: both the 1980 and 1991 offenses involved following female victims off of public transportation, and all three offenses involved using force and violence against female victims and taking them to more secluded locations. Drs. Schechter and Smith also considered the facts that White had committed offenses while on parole and, thus, while being closely monitored and with knowledge of the high risk of future imprisonment. Only a short time elapsed between his release from prison and his commission of a subsequent offense, which suggested an inability to control his behavior. Furthermore, White had reported to past evaluators that he had consensual partners available to him at the time of his offenses, which indicated his desire for nonconsensual sex. White also previously had told an evaluator he had been unfaithful in prior relationships and had a history of multiple sexual partners despite having been incarcerated for the majority of his adult life. Moreover, White had not participated in sex offender treatment despite recommendations to undergo such treatment. He previously told an evaluator he would not comply with sex offender treatment if it were mandated while he was on parole, and he failed to take responsibility or show any remorse, empathy, or concern for the harm he caused.

¶ 60    Both State experts also explained that White's particular offensive paraphilic behavior typically would not manifest itself in a controlled environment like the IDOC. This court has affirmed sexually violent person adjudications despite the absence of previous diagnoses or sexually overt acts in the controlled environment of a prison. See *Welsh*, 393 Ill. App. 3d at 455-56 (evidence held sufficient despite absence of inappropriate sexual conduct or alcohol abuse while the respondent was incarcerated and there was no diagnosis of pedophilia until three days before his release); *Lieberman*, 379 Ill. App. 3d at 602 (evidence held sufficient despite the lack of any evidence of nonconsensual sexual activity in the previous 26 years).

¶ 61    Drs. Schechter and Smith testified that White's mental disorders made it substantially probable that he would commit acts of sexual violence. In reaching this conclusion, they did not rely solely on actuarial instruments, but also considered dynamic aggravating and

protective factors not included in the historical factors. They opined that White's age of 53 years old did not diminish his risk of reoffending. Furthermore, he did not suffer from any physical ailment or medical condition that would have interfered with his ability to assault. The record did not show that White ever took part in any cognitive behavioral sex offender treatment. These findings indicated that there were no protective factors that made White less likely to reoffend. The State's experts opined that White's disorders were chronic in nature and made him much more likely than not to reoffend, and Dr. Sillitti testified that White's attitude that he did not view himself as a risk was considered to be a risk factor.

¶ 62　　White's claims simply attack the weight of the evidence and witness credibility, but it is not our function to retry him. Although Dr. Sillitti disagreed with the assessments of Drs. Schechter and Smith, the question of whether the weight of the evidence and the credibility of the witnesses proved that White was a sexually violent person was ultimately the responsibility of the jury (*Welsh*, 393 Ill. App. 3d at 455), and we will not substitute our judgment for the trier of fact's evaluation of conflicting evidence. After reviewing the record in the instant case, we find that the evidence, considered in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt the mental disorder and substantial probability elements under the Act.

¶ 63　　　　　　　　　　　　III. CONCLUSION

¶ 64　　In light of the foregoing, we affirm the judgment of the circuit court of Cook County.

¶ 65　　Affirmed.

¶ 66　　PRESIDING JUSTICE GORDON, specially concurring.

¶ 67　　I concur in the judgment only.