2022 IL App (1st) 201324-U

No. 1-20-1324

Order filed August 1, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* COMMITMENT OF ANTHONY WILSON | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 80008 |
| | ) | |
| Anthony Wilson, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Respondent-Appellant.) | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Respondent's civil commitment to a secured facility as a sexually violent person is affirmed where sufficient evidence established that he suffered from a mental disorder that predisposed him to commit acts of sexual violence.

¶ 2    Following a jury trial, respondent Anthony Wilson was found to be a sexually violent person pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq*. (West 2014)). After a dispositional hearing, the court ordered him committed to a secure facility

for treatment. On appeal, respondent contends the State did not prove beyond a reasonable doubt that he had a mental disorder that predisposed him to commit acts of sexual violence. We affirm.

¶ 3    On June 5, 2015, the State filed an amended petition to commit respondent as a sexually violent person under the Act.[1] The petition alleged that respondent had been convicted of attempted aggravated criminal sexual assault and armed violence in case No. 89 CF 15 and was sentenced to 15 years' imprisonment to be served consecutively to sentences in two other cases.

¶ 4    The State attached the report of Dr. Deborah Nicolai, a clinical psychologist. Using the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 (DSM-5), Dr. Nicolai diagnosed respondent with (1) other specified paraphilic disorder, sexually aroused to non-consenting persons, in a controlled environment (OSPD); (2) exhibitionistic disorder; and (3) antisocial personality disorder. She had originally diagnosed him as meeting the criteria for civil commitment under the Act in August 2011, when he was in prison. Respondent was found to be a sexually violent person and "currently" resided at an Illinois Department of Human Services Treatment and Detention Facility (TDF). Dr. Nicolai continued to recommend respondent be found to be a sexually violent person under the Act and thus recommended him for civil commitment.

¶ 5    The matter proceeded to a jury trial in October 2019, when defendant was 55 years old. The State presented Drs. Nicolai and Edward Smith, another clinical psychologist, and respondent called forensic psychologist Dr. Luis Rosell. Each was qualified as an expert in sex offender evaluation, interviewed respondent, and examined his Department of Corrections (DOC) "master file," including police records, court documents, medical files, and records from other institutions.

---

[1] The State's initial petition, filed on June 10, 2014, is not contained in the record on appeal.

¶ 6    Dr. Nicolai testified that she interviewed respondent in August 2011 and again in September 2019, a month before trial, and concluded that he met the criteria to be a sexually violent person. Respondent's sexual criminal history began in 1981, when he was 15 years old, continued until 2014, and demonstrated "pervasiveness in sexual offending" and "sexual deviant behaviors."

¶ 7    On January 13, 1981, respondent committed a rape for which he was convicted in May 1983. While those charges were pending on March 3, 1981, respondent forced another victim at knifepoint into an abandoned building. The victim offered defendant money and a gold chain "to not hurt her," but he ordered her to remove her pants and exposed his penis. The victim escaped. Although respondent told an interviewer at the juvenile detention facility that he was only attempting to rob the victim, he told Dr. Nicolai that he knew the victim, had sexual fantasies about consensual sex with her, and, during the incident, he placed a knife at her side, forced her into a basement, and tried to rape her. Respondent was convicted of attempted rape.

¶ 8    Dr. Nicolai testified that respondent displayed "an intense urge" because a short time elapsed between the offenses, and he attempted to rape one victim while another rape charge was pending. Respondent told Dr. Nicolai that, while he was at the Juvenile Detention Center, he exposed himself to female staff. Records also showed that respondent pushed boundaries, touched female staff, and was "sneaky and manipulative."

¶ 9    After respondent was released from the Juvenile Detention Center, he was incarcerated for non-sexual offenses, including aggravated battery, possession of a controlled substance, and attempted murder of a police officer. Then, in case number 89 CF 15, respondent was convicted of attempted aggravated criminal sexual assault and armed violence, and sentenced to 15 years' imprisonment. The facts established that, in prison on October 31, 1988, respondent "grabbed a

medical technician," placed a knife to her throat, ordered her onto the floor, and told her to remove her pants. The victim screamed and respondent fled. When respondent discussed the incident with Dr. Nicolai, he stated that he went to the medical facility to engage in consensual sex with the victim.

¶ 10    Respondent received approximately 50 tickets for sexual misconduct in the DOC from 1985 through 2009. These included incidents where respondent grabbed another inmate's groin and said, "when you [*sic*] going to give this up and be my man?" Defendant touched a nurse's arm, commented that her skin was soft, then touched his groin and said, "look what you've done to me." Another 43 misconducts were "for exposing himself, exposing his genitals to female staff and/or masturbating in front of female staff."[2] Respondent directed these behaviors against different female staff members, showing that he was not attracted to a particular person but, rather, was "the problem here."

¶ 11    Dr. Nicolai noted that 50 tickets was a "huge number." Respondent also received approximately 430 disciplinary citations, "a very large number" indicative of "difficulty controlling behavior."[3] Additionally, respondent was convicted of multiple offenses that he committed while imprisoned or on probation from 1984 through 1992.

¶ 12    On October 6, 2011, respondent was admitted to the TDF, where he committed numerous rule violations, including possession of hard core pornography (July 2012), touching a female staff member by reaching into her apron pocket (August 2012), attempting to open the office door of a

---

[2] Dr. Nicolai testified that she did not read tickets for five other incidents on respondent's disciplinary ticket list.

[3] Dr. Nicolai initially testified that respondent received 340 disciplinary tickets, but later testified that he received 430 tickets. Dr. Smith also testified that respondent received 430 disciplinary tickets.

female staff member (August 2012), attempted staff manipulation (May 2014), masturbating in the day room (June 2014), masturbating in a social group (November 2014), and displaying a fully erect penis (January 2017).

¶ 13    Dr. Nicolai explained that the Act defines a mental disorder as a "congenital or acquired mental condition that effects emotional and volitional capacity and predisposes the individual to sexual violence." Congenital conditions are those that individuals "are born with" or "acquired in development." Cognitive distortions are disordered ways of thinking which require recognition to change. A paraphilic disorder occurs when a paraphilia causes harm, distress, or impairment to the individual, or risks harm to others.

¶ 14    Dr. Nicolai diagnosed respondent with (1) OSPD; (2) exhibitionistic disorder, sexually aroused to exposing genitals to physically mature persons in a controlled environment; and (3) antisocial personality disorder. Respondent met the criteria for OSPD because he had multiple convictions involving sexual behaviors with nonconsenting females, "identified sexual arousal to empower and control," and demonstrated intense sexual urges. Dr. Nicolai believed respondent "still" suffered from paraphilic disorder, non-consenting females, because he demonstrated manipulative behaviors, sexually objectified staff, and masturbated in front of staff during treatment.

¶ 15    Respondent also met the criteria for exhibitionistic disorder because for "many years," and as recently as 2014, he has been sexually aroused by exposing himself to female staff at the DOC and to women in the community. An exhibitionistic disorder is in remission if the behaviors are not present for at least five years outside of a controlled environment. No evidence showed that respondent's exhibitionistic disorder was in remission.

¶ 16    Respondent met the criteria for antisocial personality disorder because he displayed six of seven facets of the disorder, including impulsivity, irritability or aggressiveness, lack of concern for others, lack of remorse for victims, exhibiting relevant conduct prior to age 15, and the behaviors did not occur exclusively in the course of schizophrenia, a manic episode, or bipolar disorder. Dr. Nicolai believed respondent still suffered from the disorder and it impacted his paraphilic disorders. According to Dr. Nicolai, respondent's mental disorders predispose him to commit acts of sexual violence and make it difficult for him to control his behavior.

¶ 17    Dr. Nicolai assessed respondent's risk of recidivism using actuarial instruments Static-99R and Static-2002R. Respondent scored in the highest risk categories for both instruments. Respondent also had dynamic risk factors associated with increased risk to reoffend, including deviant sexual interest, multiple paraphilias, sexual preoccupation, sex as coping, lifestyle impulsivity, poor problem solving, lack of emotionally intimate relationships with adults, negative social influences, resistance to rules and supervision, antisocial personality disorder, and substance abuse. On the Hare psychopathy check list, respondent scored in the high range of psychopathic traits compared to other male prisoners, suggesting that he was likely to reoffend more quickly, frequently, and violently upon release.

¶ 18    Protective factors for decreased risk to reoffend, including respondent's age, potential medical conditions, and treatment, did not apply. Although respondent participated in treatment, his progression was insufficient to reduce his risk to reoffend. Dr. Nicolai considered it substantially probable that respondent would engage in future acts of sexual violence and concluded that he was dangerous because he suffered from a congenital disorder which predisposed him to commit acts of sexual violence.

¶ 19    On cross-examination, Dr. Nicolai agreed that her opinion relied in part upon her first interview with respondent in 2011, her 2019 second interview, her 2011 evaluation of respondent, and Dr. Smith's 2015 evaluation. The Static-99R diagnostic does not consider treatment, and the dynamic risk factor of sexual preoccupation has a low correlation to reoffending. Respondent's exhibitionistic disorder is not violent *per se*, but is "entwined" with his OSPD.

¶ 20    Respondent signed a consent for treatment when he was admitted to TDF and completed two phases of treatment. Completion of treatment lessens the risk to reoffend, but "[i]t depends on a lot of factors." The majority of respondent's violations occurred in the DOC, and the majority of the remaining offenses occurred at TDF between 2011 and 2014, although he had two incidents in 2019. Respondent last exposed himself to staff at TDF in January 2017.

¶ 21    On redirect examination, Dr. Nicolai testified that at respondent's level of treatment, he had not yet learned how to intervene to reduce his own risk.

¶ 22    Dr. Smith testified that he met with respondent in November 2011, and concluded that respondent met the criteria for a sexually violent person. He updated his report in July 2015, and his conclusion did not change. Dr. Smith diagnosed respondent with OSPD, exhibitionistic disorder, and antisocial personality disorder. Dr. Smith opined that these disorders impacted his ability to control his sexually violent behaviors.

¶ 23    Respondent's OSPD manifested when he attempted to isolate and sexually assault women during offenses that resulted in convictions in 1981 and 1988. Respondent initially denied committing the offenses, but later acknowledged that he planned to sexually assault both women, fantasized about the acts, and experienced sexual gratification by the assaults. Dr. Smith also found events from June and November 2014, where respondent masturbated while watching female staff

members, relevant to the diagnosis. Dr. Smith testified that the disorder is "reasonably chronic," and continues to be a "significant issue."

¶ 24    Regarding exhibitionistic disorder, respondent had 39 incidents of exposing himself or masturbating in front of female staff at the DOC. Respondent reported hoping that someone would see him and "like it," and derived sexual pleasure from the thoughts. According to Dr. Smith, respondent still suffered from exhibitionistic disorder because his pattern of behavior and number of incidents over a long period of time "typically [does not] just go away on their own."

¶ 25    Lastly, regarding antisocial personality disorder, respondent had a longstanding pattern of violating the rights of others. He participated in gang activity as an adolescent, committed his first sex offense at age 16, and accumulated approximately 430 disciplinary tickets while incarcerated, including for serious assaults and batteries. Respondent's antisocial personality disorder caused him difficulty controlling his behavior, a condition which does not "just disappear."

¶ 26    Dr. Smith also conducted a recidivism risk assessment using Static-99R. Respondent's likelihood to reoffend was 7.32 times more than a typical offender, placing him within the 98.5 percentile of offenders. Dr. Smith also found multiple dynamic risk factors, including deviant sexual interest, hostility, impulsiveness, antisocial personality disorder, substance abuse, neglect or physical abuse, and attitude toward sexual offending. The protective factors of age, health status, and successful completion of sex offender treatment did not apply. Although respondent was in the third phase of treatment, participated in therapy, and made "good progress," he still needed work on some skills before developing a relapse prevention plan.

¶ 27    Dr. Smith concluded that respondent was substantially probable to commit future sexual violence and that he met the criteria of a sexually violent person under the Act.

¶ 28    On cross-examination, Dr. Smith stated that he had not interviewed respondent since his first evaluation in 2011, but reviewed treatment records from TDF through August 2019. In order to enter phase three of treatment, respondent took a polygraph examination regarding his sexual offenses. Respondent was in "the middle" of the third phase, and Dr. Smith acknowledged respondent was "involved," "engaged," and "working hard." Over time, respondent significantly reduced his antisocial behaviors. At the time of trial, respondent had identified aspects of his offending cycle and potentially could recognize them in himself. Many of respondent's offenses happened during his segregation at TDF. The protective factor of completion of treatment requires "consistent application and being able to continually monitor and adapt his behaviors."

¶ 29    On redirect examination, Dr. Smith testified that although respondent had progressed in treatment, he was still "having issues," including an incident in 2019 where he made female staff uncomfortable.

¶ 30    Respondent called Dr. Rosell, who testified that he met with respondent on January 15, 2015.[4] Dr. Rosell opined that respondent did not meet the criteria for a sexually violent person under the Act. Instead, respondent suffered from antisocial personality disorder, which "could" qualify him as a sexually violent person, but in his case, did not.

¶ 31    Dr. Rosell asserted that a diagnosis of nonconsent paraphilia was "controversial" because it lacked criteria and had been "basically used as a way of saying this person has committed rape." While the DSM-5 includes OSPD, an attempt to legitimize a paraphilic coercive disorder or rape

-----

[4] Dr. Rosell also testified he interviewed defendant a second time prior to writing his supplemental report on October 23, 2019, but did not specify when the second interview occurred.

paraphilia in the DSM was rejected; notwithstanding, according to Dr. Smith, it "still gets used in courts."

¶ 32    Additionally, Dr. Rosell opined that respondent was not a "true exhibitionist" because he never exposed himself to people outside of prison, but only to people he saw every day, who would not be "unsuspecting." Respondent's masturbation was only relevant as to the circumstances of how staff "caught" him and was not otherwise uncommon behavior.

¶ 33    Dr. Rosell acknowledged that respondent scored "well above average" for the Static-99R and Static-2002R instruments, but noted that his score on the former corresponded with a 27 percent reconviction rate. Dr. Rosell believed that respondent's treatment should be a mitigating factor because he engaged voluntarily. Further, completion of treatment should not be necessary, because commitment treatment programs often lack end dates, whereas noncommitment programs often can be completed in one or two years. Accordingly, respondent participated in significantly more treatment than many people who have completed the program, which decreased the likelihood of future sexual violence. Dr. Rosell concluded that respondent was not substantially probable to reoffend and did not meet the criteria for a sexually violent person under the Act.

¶ 34    On cross-examination, Dr. Rosell stated that because some of respondent's victims may have been unsuspecting, respondent potentially met all criteria for exhibitionistic disorder. Dr. Rosell opined that respondent no longer engaged in the behavior, so civil commitment was unnecessary. Dr. Rosell stated that while he was unable to diagnose rape patterns using the DSM-5, "[i]t is allowed," and a nexus could exist between respondent's antisocial personality disorder and the rapes.

¶ 35    Dr. Rosell stated that respondent controlled "his sexually acting out" since 2013, but was ticketed for masturbating in June and November 2014, and was using medication to control sexual arousal in 2015. Respondent also engaged in behaviors that made female staff uncomfortable from 2012 through 2019. During treatment, respondent acknowledged that he began exposing himself because he was angry, but then continued because he became aroused and fantasized about the victims.

¶ 36    Respondent testified that he had been imprisoned for 35 years. When respondent was 13 years old, he left home due to his father's physical abuse. After incarceration, respondent had "come to grips" with the reasons for his conduct in the institutions and accepted responsibility. Respondent was in the third stage of treatment, "learning the cycle" and dealing with his stressors, including prison life, prison abuse, and childhood sexual abuse. Respondent was "out of control" in 1988, but at the time of trial, "fe[lt] good about" his progress because he was no longer fantasizing about exposing himself or harming others.

¶ 37    On cross-examination, respondent acknowledged that he had a total of 31 victims, most of whom he exposed himself to. Respondent denied exposing himself to a librarian and ejaculating on the floor, and commented that most tickets he received were "retaliation for the offense that [he] committed in Menard." Respondent also stated that he found exposing himself to be arousing, and sometimes believed his victims enjoyed it.

¶ 38    In closing, the State argued that all three doctors found that respondent suffered from antisocial personality disorder, which could qualify him as a sexually violent person under the Act. Further, Drs. Nicolai and Smith diagnosed OSPD and exhibitionistic disorder, also qualifying defendant as sexually violent. Respondent had struggled with these disorders for over 30 years,

and despite treatment, "the work" was not done and he was in the highest category of risk to reoffend.

¶ 39     The jury found respondent to be a sexually violent person under the Act. On November 5, 2020, after a dispositional hearing, the court entered judgment on the verdict and committed respondent to the custody of the Department of Human Services (DHS) for control, care, and treatment in a secure setting until further court order.[5]

¶ 40     On appeal, respondent contends that the State failed to prove beyond a reasonable doubt that he suffered from a mental disorder as defined by the Act where the State's experts speculated about his sexual interests and cognitive disorders and failed to explain their opinions.

¶ 41     On a challenge to the sufficiency of the evidence, we consider "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. The trier of fact is responsible for assessing the witnesses' credibility, weighing the testimony, and drawing reasonable inferences from the evidence. *In re Detention of Liberman*, 379 Ill. App. 3d 585, 602 (2007). Accordingly, this court will not substitute its judgment regarding the credibility of witnesses or the weight of the evidence, and will not reverse a jury's determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt that the respondent is a sexually violent person. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 42     The Act authorizes that sexually violent persons be committed to the custody of DHS for control, care, and treatment. 725 ILCS 207/40(a) (West 2014). A sexually violent person is "a person who has been convicted of a sexually violent offense *** and who is dangerous because he

---

[5] The transcript of the dispositional hearing is not included in the record on appeal.

or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2014).

¶ 43     Respondent only challenges the sufficiency of the evidence to prove that he presently suffers from a mental disorder defined by the Act. A "mental disorder" is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2014). For involuntary commitment, the Act requires the existence of only one condition that predisposes a person to engage in sexual violence. *White*, 2016 IL App (1st) 151187, ¶ 57.

¶ 44     We find the evidence sufficient to support the jury's determination that defendant suffered from a mental disorder under the Act. Drs. Nicolai and Smith testified that they used the DSM-5 in evaluating respondent and concluding that he suffered from mental disorders defined by the Act. They diagnosed OSPD, exhibitionistic disorder, and antisocial personality disorder. Respondent met the criteria for OSPD because he had multiple convictions for sexual offenses against nonconsenting females, "identified sexual arousal to empower and control," and demonstrated intense sexual urges. During treatment, respondent demonstrated manipulative behaviors, sexually objectified staff, and masturbated in front of staff, and the condition was not resolved at the time of trial.

¶ 45     Additionally, Drs. Nicolai and Smith diagnosed respondent with exhibitionistic disorder due to his sexual arousal when exposing himself to female staff as late as 2017. The DSM-5 establishes that the disorder is in remission if the behaviors were not present for at least five years outside of a controlled environment. Dr. Nicolai opined that respondent's mental disorders predisposed him to engage in acts of sexual violence. Lastly, the State's experts and respondent's

own expert, Dr. Rosell, diagnosed respondent with antisocial personality disorder which, on its own, could generally qualify respondent to be a sexually violent person. See *White*, 2016 IL App (1st) 151187, ¶ 57. Where two expert witnesses diagnosed respondent with multiple conditions which predisposed him to engage in acts of sexual violence, the jury could find defendant suffered from a qualifying mental disorder under the Act.

¶ 46    Respondent nevertheless contends that the State's experts relied heavily on his sexual offenses between 1981 and 2014, but failed to establish that he still suffered from the same underlying disorders at the time of trial on the State's petition in 2019. Respondent argues that the State's experts speculated as to whether he was credible during interviews regarding his admissions and disclosures of his own sexual fantasies, and that his paraphilic sexual interests do not alone establish a mental disorder. He further contends that evidence contradicts that he had OSPD and exhibitionistic disorder.

¶ 47    Respondent's contentions amount to an improper request for this court to substitute our judgment for that of the trier of fact and reweigh the evidence. See *id.*, ¶ 56. As noted, the State's witnesses testified that they did not merely rely upon respondent's prior convictions and "old evaluations," but on a long history of sexual offenses at the DOC and TDF, including an incident in 2017. Further, Dr. Nicolai interviewed respondent in September 2019, approximately a month before trial, and testified that he continued to display manipulative behaviors and sexually objectify staff. Dr. Smith also testified that respondent's OSPD was "chronic" and continued to be a "significant issue."

¶ 48    Although respondent's expert witness Dr. Rosell disagreed that respondent had a qualifying mental disorder under the Act, disagreement between experts does not render the

evidence insufficient. See *In re Detention of Welsh*, 393 Ill. App. 3d 431, 456-57 (2009). Further, Dr. Rosell acknowledged that respondent suffered from antisocial personality disorder, which he conceded alone "could" support a sexually violent person adjudication. See *White*, 2016 IL App (1st) 151187, ¶ 57 ("The Act requires the existence of only one condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence" and "nothing in the plain language of the Act prohibits a commitment from being based on a combination of conditions that make it substantially probable that the person will engage in acts of sexual violence.")

¶ 49 Respondent further argues that neither Dr. Nicolai nor Dr. Smith articulated reasons for concluding that, in 2019, he suffered from a mental disorder under the Act. As noted, however, the experts comprehensively explained their 2019 opinions and diagnoses based on respondent's criminal history and sexual conduct in the DOC and, more recently, in treatment. They explained how respondent's behaviors fit the diagnostic criteria for the disorders, and how the disorders were not in remission. Again, we will not substitute our judgment for that of the factfinder regarding the credibility of the witnesses and weight of the evidence. See *id.*

¶ 50 Viewing the evidence in the light most favorable to the State, we cannot determine that no rational trier of fact could have found that respondent was a sexually violent person. See *Fields*, 2014 IL 115542, ¶ 20. The evidence, thus, is not so improbable or unsatisfactory that it leaves a reasonable doubt that respondent is a sexually violent person. See *White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 51 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 52 Affirmed.