2021 IL App (1st) 192565-U

No. 1-19-2565

Order filed June 21, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* COMMITMENT OF JAMES SYKES | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12 CR 80013 |
| | ) | |
| James Sykes, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Respondent-Appellant.) | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Respondent's civil commitment to a secured facility as a sexually violent person is affirmed over his contentions that insufficient evidence established that he suffered from a mental disorder or was "much more likely than not" to commit future acts of sexual violence.

¶ 2    Following a bench trial, the circuit court found respondent James Sykes to be a sexually violent person pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2012)), and after a dispositional hearing, ordered him committed to a secure facility

for treatment. On appeal, respondent contends the State failed to prove beyond a reasonable doubt that he was a sexually violent person where it did not establish whether he suffered from a congenital or acquired mental disorder and that it was "much more likely than not" that he will commit future acts of sexual violence. We affirm.

¶ 3     On November 28, 2012, the State filed a petition to commit respondent as a sexually violent person under the Act. The petition alleged that respondent had been convicted in 2005 of aggravated criminal sexual abuse (case number 01 CR 17450) and sentenced to 23 years in prison.

¶ 4     In support of the petition, the State attached the report of its expert, Dr. John Arroyo, a clinical psychologist, who diagnosed respondent with a paraphilic disorder using the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (DSM-IV). In May 2013, the fifth edition of the DSM was issued (DSM-V). On February 14, 2014, Dr. Arroyo amended the evaluation to reflect the updated nomenclature of the DSM-V, diagnosing respondent with other specified paraphilic disorder, sexually aroused to non-consenting persons, in a controlled environment, and other specified personality disorder, antisocial features (antisocial personality disorder). The State then amended the petition to reflect the updated diagnoses.

¶ 5     The matter proceeded to a bench trial which began on March 27, 2019. The State presented the testimony of Dr. Arroyo and Dr. Steven Gaskell, another clinical psychologist, and respondent called clinical psychologist Dr. Romita Sillitti. Each was qualified as an expert in sex offender evaluation, interviewed respondent, and examined respondent's Department of Corrections (DOC) "master file," which contained, in pertinent part, respondent's criminal history, DOC disciplinary history, prior mental health evaluations, Department of Human Services (DHS) records, and certain police reports.

¶ 6     Dr. Arroyo testified that he met with respondent, then 74 years old, in September 2012. Dr. Arroyo prepared an initial report on September 28, 2012, and a second report on February 14, 2014, after the DSM-V was published and the names of certain disorders changed. He concluded that respondent met the criteria to be a sexually violent person.

¶ 7     Dr. Arroyo then reviewed respondent's criminal history. In case number 01 CR 17450 respondent was charged with four counts of aggravated criminal sexual abuse, entered a plea to one count of aggravated criminal sexual abuse, and was sentenced to 23 years in prison. The facts of the case indicated that respondent offered the victim a place to stay and thereafter sexually assaulted her. The victim told police that respondent said she was pretty, he wanted to "f**" her, and he would "stick her" if she did not comply. Although respondent denied engaging in sexual activity with the victim, his DNA was found on a vaginal swab. Two additional offenses were thereafter linked to respondent through a DNA match. When Dr. Arroyo asked respondent about the underlying incident, respondent said he and the victim got high and tried having sexual intercourse, and she later accused him of rape because he did not give her money.

¶ 8     Dr. Arroyo further testified that in case number 85 CF 6637, respondent was convicted of three counts of kidnapping, and one count each of aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, unlawful restraint, and solicitation of a juvenile prostitute. Respondent entered a plea, the convictions were "merged," and he was sentenced to six years in prison. In that case, respondent slapped and punched the victim, forced her to engage in sexual intercourse, and attempted to force her into prostitution. Respondent told Dr. Arroyo the victim was a friend who accused him of rape after being threatened by the police.

¶ 9    In 1977, respondent was charged with first degree sexual assault in Wisconsin, pled guilty to second degree sexual assault, and was sentenced to five years in prison. In that case, respondent used a firearm to force the victim, the wife of respondent's cousin, to go to a motel, remove her clothing, and allow him to insert his penis in her vagina. When asked about this offense, respondent stated that he asked the victim for help finding a job, they had sex, and the victim accused him of rape because she was afraid her husband would find out.

¶ 10    In 1973, respondent pled guilty to a sex offense in Wisconsin and was sentenced to five years in prison. In that case, respondent pointed a firearm at the minor victim, took her to a rooming house, and threatened to "bash in her ribs," "rip out her eyes," and "put her to sleep." The victim stated that during the sexual assault respondent had a butcher knife and a screwdriver. Respondent told Dr. Arroyo that he met the victim at a bar and did not know her age, but that she was a runway whose father was a "big name," and denied having sex with her.

¶ 11    In 1968, respondent, while armed with a butcher knife, struck the victim and threatened her children. He then engaged in sexual intercourse with the victim while choking her with his belt. Respondent told Dr. Arroyo that the victim, his first cousin, accused him of rape following an argument.

¶ 12    At trial, Dr. Arroyo noted that during treatment, respondent initially denied committing the sexual offenses. However, he later admitted that the victim in case number 01 CR 17450 told him to stop but he waited until she was intoxicated and "almost passed out" before "offend[ing] against her." Respondent further stated that he did not want to offend, but that it was something that "just took place" when he was high. In January 2019, respondent admitted that he pretended to have a knife and told the victim he would "stick" her. Respondent's statements were relevant to Dr.

Arroyo's analysis because as respondent continued treatment, he began to admit some of the offenses.

¶ 13    In addition to respondent's convictions, Dr. Arroyo also testified regarding cases where respondent was arrested or charged with sexual offenses. In 1985, respondent was arrested after using a firearm to force a victim to engage in sexual intercourse four times, but the victim subsequently left the state and could not be located. In 1992, respondent was charged with criminal sexual assault and battery, and in September and October 1999, he was charged with aggravated criminal sexual assault in two different cases; these cases were all dismissed. In 2000, after learning that respondent had been accused of rape, his step-granddaughter reported that in 1992, when she was eight years old, respondent fondled her breasts and "private parts."

¶ 14    Dr. Arroyo opined that respondent callously used other people and seemed to be remorseless. He noted that respondent had offended between 1968 and 2001, was still offending "well into his 50s," and continued to offend after being sanctioned for the same behavior. Dr. Arroyo further noted that respondent's criminal background also included convictions for assault, battery, theft, and attempt murder, and that the number of sexual and nonsexual offenses were "pretty even." He explained that research showed that the combination of paraphilia and antisocial personality disorder can increase the risk of recidivism.

¶ 15    Regarding respondent's behavior while incarcerated, Dr. Arroyo noted that between 1986 and 1991, respondent had 55 disciplinary "tickets," which was above average compared to typical male inmates. Between 2005 and 2012, respondent had 18 tickets which was almost average. Dr. Arroyo explained that although the expectation was that "acting out behaviors should be minimal" as an inmate aged, respondent continued to receive disciplinary infractions at the treatment facility

where he was placed at the time of trial, including a fight in 2016 and an attempted fight in 2017. As to the 2016 incident, respondent initially stated that the victim was injured in a fall, but later admitted hitting the victim and that he should have walked away. Respondent also admitted that he attempted to hit another person in 2017.

¶ 16    Dr. Arroyo explained that the Act defines a "mental disorder" as a condition impairing an emotional and volitional capacity, making it substantially probable that a person will engage in further acts of sexual violence, and impacting the way an individual responds to the world. For example, paraphilia makes an individual believe it is "okay" to take what he wants and to use others for personal gain. Dr. Arroyo diagnosed respondent with other specified paraphilic disorder, sexually aroused to non-consenting persons, in a controlled environment, with a secondary diagnosis of antisocial personality disorder. Dr. Arroyo explained that other specified paraphilic disorder is a congenital or acquired disorder, and "paraphilia" is any persistent and intense sexual interest other than sexual interest in genital stimulation or preparatory fondling with "normal," physically mature, consenting human partners. Paraphilia becomes a disorder when it causes a person distress or impairment, or its satisfaction harms or risks harming others.

¶ 17    In respondent's case, paraphilia rose to the level of a disorder because over the course of 50 years he engaged in harmful behavior against individuals who did not consent. Respondent's pattern involved either a weapon, a threat of force, or pretending to have a weapon followed by sexual activity against the will of the other person. While in treatment in 2017, respondent admitted to fantasies involving adult females, force, and sexual contact, and arousal by the use of force. Although respondent reported he felt bad after this conduct, the facts that he only admitted to offenses in the two years before trial and continued to offend while in his fifties impacted Dr.

Arroyo's analysis. Dr. Arroyo concluded that respondent "still" met the criteria to be a sexually violent person.

¶ 18     The criteria for other specified personality disorder includes a pervasive pattern of disregard for, or violation of, the rights of others since the age of 15. Dr. Arroyo noted respondent's history of conduct that was grounds for arrest and that he continued "act[ing] out" although he should be able to anticipate the consequences of that behavior. Dr. Arroyo acknowledged that respondent was diagnosed with posttraumatic stress disorder (PTSD) but did not believe this explained respondent's history of sexual offenses.

¶ 19     Dr. Arroyo concluded that respondent's mental disorders were congenital or acquired conditions that affected his emotional or volitional capacity, predisposed him to commit acts of sexual violence, and made it more difficult for respondent to control his behavior. Dr. Arroyo did not think there had been enough treatment to mitigate the behavior, as respondent had "just" begun to "make connections" regarding his actions.

¶ 20     Dr. Arroyo also conducted a risk assessment, using the Static-99R actuarial instrument and the Hare Psychopathy Checklist Revised instrument, to determine respondent's risk of reoffending. In addition, Dr. Arroyo considered numerous dynamic and protective risk factors. Respondent's score of four on the Static-99R placed him at an above average risk of reoffending, put him in the 80th percentile of individuals scored by that instrument, and made him 1.94 times more likely to reoffend. The Hare Psychopathy Checklist Revised measured "the amount of psychopathic traits or antisocial traits" in a person. Respondent scored at a "a moderate level of psychopathy," and fell into the "callous/conning category."

¶ 21    Dr. Arroyo also considered numerous dynamic risk factors, which increased respondent's probability of reoffending, and "protective factors" which decreased the risk of reoffending, such as age and medical issues. Although respondent was 74 years old, his mobility was not limited, he could use weapons to gain compliance, and his fantasies of force did not always include penile penetration, meaning that even if his mobility were limited, he would still be able to act on his fantasies of oral or digital penetration. Additionally, respondent completed only two of the five phases of sex offender specific cognitive behavioral treatment and his progress was slow. In October 2018 respondent was still "minimizing" his behavior, and in 2019 respondent was "just starting to admit" he used force and threatened the victim during his first sexual offense. Dr. Arroyo therefore concluded that respondent was "substantially probable," that is, much more likely than not, to engage in further acts of sexual violence.

¶ 22    During cross-examination, Dr. Arroyo testified that the 2012 evaluation lasted 90 minutes and he did not meet with respondent in 2014 when he updated the evaluation. For each of respondent's convictions, he entered a guilty plea. Dr. Arroyo also considered cases that did not result in convictions in order to determine a pattern of behavior. Dr. Arroyo acknowledged that respondent had a history of drug abuse which only ended when he went to prison in 2001, that respondent's version of some offenses indicated that he or the victim was high, and that drug abuse could motivate a sexual offense.

¶ 23    Dr. Gaskell testified that he met with respondent on March 12, 2013, and concluded that respondent met the criteria for a sexually violent person. He diagnosed respondent with other specified paraphilic disorder sexually attracted to nonconsenting females nonexclusive type, antisocial personality disorder, and substance abuse disorder. In respondent's case, other specified

sexually paraphilic disorder sexually attracted to nonconsenting females nonexclusive type manifested in a 33-year history of sexual behaviors with nonconsenting females. Additionally, in treatment respondent talked about having fantasies regarding nonconsensual sex with females around the time of the offense in case number 01 CR 17450.

¶ 24 Regarding antisocial personality disorder, respondent had a pervasive pattern of disregarding and violating the rights of others. Specifically, respondent failed to conform with social norms by repeatedly performing acts that were grounds for his arrest, showing a reckless disregard for the safety of others, and failing to maintain consistent work behavior. Dr. Gaskell testified that respondent's antisocial personality disorder made him more likely to act on his deviant sexual interests and that his substance abuse was reflected in the facts that show he was intoxicated during all of his sexual offenses and high for two.

¶ 25 These disorders affected respondent's emotional or volitional capacity and predisposed him to engage in future acts of sexual violence. Additionally, the disorders impacted respondent's decision-making ability because his desire for sexual contact was sufficiently strong that it overwhelmed his ability to consider various decisions, their consequences, and the harm they may cause others. Dr. Gaskell concluded these disorders predisposed respondent to commit acts of sexual violence and were not likely to resolve absent treatment.

¶ 26 Dr. Gaskell also conducted a risk assessment using two instruments, the Static-99R and Static-2002R, and two "meta-analyses," one involving over 28,000 sex offenders and another involving over 32,000 sex offenders, to determine an overall risk assessment. On the Static-99R, respondent scored four, placing him in the second highest risk category, and was 1.94 times more likely than the average sex offender to commit another sexual offense. On the Static-2002R,

respondent scored six, which fell into the second highest risk category, and was 2.63 times more likely than the average sex offender to commit another sexual offense. Dr. Gaskell also found multiple dynamic risk factors, including deviant sexual interest, personality disorder, hostility, impulsiveness, recklessness, employment instability, substance abuse, intoxication during the offenses, and noncompliance with supervision. The protective factors of age, health status, and progress in sex offender treatment did not apply; to the contrary, respondent was in the earliest stages of treatment and struggled to take responsibility for his actions. Although respondent was previously diagnosed with PTSD and major depressive disorder, there was no direct link between PTSD and paraphilic disorder.

¶ 27    Dr. Gaskell therefore concluded that it was substantially probable, that is, more likely than not, that respondent would commit future acts of sexual violence and that he met the criteria to be found a sexually violent person under the Act.

¶ 28    During cross-examination, Dr. Gaskell stated he did not know when respondent's substance abuse began. Although he was "aware" that respondent claimed to have been a prisoner of war in Vietnam and reported PTSD between 2006 and 2008, in 2004 respondent reported no prior mental health history, he did not report PTSD between 2008 and 2012, and the issue only "pop[ped] up again" when he was in treatment. Dr. Gaskell acknowledged that he had not reviewed Veterans' Administration records.

¶ 29    Respondent called Dr. Sillitti, who testified that she met with him on June 11, 2013, and August 4, 2013. During their meeting, respondent described himself as a "slow learner" in school, indicated that he served in the Marine Corps in Vietnam, and stated he was treated for PTSD. Respondent's learning disability led him to create a "tough guy persona" and join the military.

While in Vietnam, respondent used alcohol and opium daily. When he returned to the United States, he used heroin, crack cocaine, marijuana, and alcohol on a daily basis. Respondent then began his criminal behavior, joining a gang and becoming a "lightweight pimp."

¶ 30    Regarding the offense in case number 01 CR 17450, respondent denied raping the victim; rather, he took her masturbating as an "invitation" to consensual sex. Respondent also denied culpability in the 1968 offense and stated that he was accused due to family problems. Respondent explained that his nonsexual convictions arose from gang involvement, selling narcotics, and being angry. Although Dr. Sillitti considered respondent's convictions in the evaluation, she did not give as much weight to cases where he was charged but not convicted. She also considered respondent's understanding and recollection of the offenses and whether it matched the "file." Her review of respondent's disciplinary records from prison and the treatment center did not reveal any sexual offenses.

¶ 31    Dr. Sillitti concluded that respondent suffered from PTSD, other personality disorder, and substance abuse disorder. She diagnosed respondent with other specified personality disorder because he met criteria for antisocial personality disorder and narcissistic personality disorder. She did not diagnose respondent with other specified paraphilia because the "broadness" of that disorder meant that "every single person who has ever raped more than once over a period of six months and got convicted would fall into that category." Dr. Sillitti acknowledged that respondent qualified for a diagnosis of other specified paraphilia disorder but clarified that due to its "broad description," she used clinical judgment to determine whether the repeated rapes reflected a paraphilic disorder or other contributing factors.

¶ 32    Dr. Sillitti noted that when respondent returned from Vietnam, he exhibited aggression and became involved in criminal activity. Respondent's pattern was "consistent," in that he got high to escape the symptoms of PTSD and other issues such as his father's death, unemployment, the breakup of his marriage, and his disappointment in himself. Dr. Sillitti concluded that respondent's "pattern" was to engage in criminal activity to "feel good regardless of the consequences," rather than a sexual interest in rape. She explained that each time respondent committed a sexual offense, he was using narcotics and unhappy with his life. Additionally, the breadth of respondent's criminal conduct indicated he broke rules to obtain what he wanted regardless of consequences. In other words, "sex is just one of the things that he uses to make himself feel better." She therefore diagnosed him with antisocial personality disorder.

¶ 33    Dr. Sillitti also completed the Static 99-R and the 2002-R and acknowledged that respondent's scores placed him at above average risk to reoffend.

¶ 34    During cross-examination, Dr. Sillitti opined that respondent did not meet the criteria for a sexually violent person. However, she admitted that respondent had been convicted of a qualifying sexually violent offense. Additionally, Dr. Sillitti recognized the same dynamic and protective risk factors, and reached the same conclusions based on the actuarial tables, as did the State's witnesses. She also acknowledged that because respondent's criminal history began before he served in Vietnam, his entire criminal history could not be attributed to PTSD. Dr. Sillitti explained that respondent's other specified personality disorder, which is a congenital or acquired condition, predisposed him to engage in criminal activity including sexual offenses. She then acknowledged that this disorder qualified as a mental disorder under the Act, and respondent met the criteria for paraphilic disorder and had the risk to reoffend.

¶ 35    In closing argument, the State noted that all three witnesses agreed that respondent met the criteria for other specified paraphilic disorder and posed a risk to reoffend. In response, respondent's counsel argued that although Dr. Sillitti testified that respondent met the criteria, she concluded that he suffered from PTSD and substance abuse.

¶ 36    In finding respondent to be a sexually violent person under the Act, the court noted that even respondent's witness admitted that he qualified for a paraphilia diagnosis, although in her clinical judgment she did not make such a diagnosis. The court found this conclusion inconsistent and was not persuaded by Dr. Sillitti's testimony. Accordingly, the court determined that respondent met the criteria for a sexually violent person when he was convicted of the requisite qualifying offense, suffered from mental disorders as defined by the Act and testified to by Dr. Arroyo and Dr. Gaskell, and these mental disorders were congenital or acquired conditions affecting respondent's emotional or volitional capacity which predisposed him to commit acts of sexual violence. Moreover, respondent's mental disorders made it substantially probable that he would engage in sexual violence in the future.

¶ 37    At the dispositional hearing, respondent's counsel asked that he receive conditional discharge in light of his age and health. The State responded that respondent was only at the second stage of his treatment plan and continued to be physically aggressive in the treatment center. On September 9, 2019, the court entered judgment on its finding that respondent was a sexually violent person and committed respondent to the custody of DHS for control, care, and treatment in a secure setting until further court order.

¶ 38    On appeal, respondent contends that there was insufficient evidence to establish that he was a sexually violent person beyond a reasonable doubt.

¶ 39    When reviewing a challenge to the sufficiency of evidence, this court considers whether "viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. The trial court, as the trier of fact, is responsible for resolving conflicts in the evidence, determining witness credibility, and the weight afforded to particular testimony. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56. On appeal, we may not substitute our judgment for that of the trier of fact and will not reverse its determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Id.*

¶ 40    The Act authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment." 725 ILCS 207/40(a) (West 2012). The Act defines a "sexually violent person" as someone "who has been convicted of a sexually violent offense" and "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2012). The Act defines a "mental disorder" as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2012). Although the Act states that proceedings thereunder are "civil in nature" (725 ILCS 207/20 (West 2012)), it further provides that the State bears the burden of proving beyond a reasonable doubt that a person is a sexually violent person (725 ILCS 207/35(f) (West 2012)). If a court or jury determines a person is sexually violent under the Act, he may be indefinitely committed "until such time as the person is no longer a sexually violent person." 725 ILCS 207/35(f), 40(a) (West 2012).

¶ 41    In this case, to establish that respondent was a sexually violent person under the Act, the State had to prove beyond a reasonable doubt that respondent was convicted of a sexually violent offense, respondent has a mental disorder, and the mental disorder created a "substantial probability" that he will engage in acts of sexual violence. 725 ILCS 207/15(b)(1)(A), (b)(4), (b)(5) (West 2012).

¶ 42    Here, respondent concedes that he was convicted of at least one sexually violent offense. However, he contends that evidence was insufficient to prove that he suffers from a mental disorder because, contrary to the plain language of the statute, the State failed to establish the nature of his mental disorder, that is, whether it was "a congenital or acquired condition." Respondent further contends that there was insufficient evidence to establish he was "much more likely than not" that to commit future acts of sexual violence.

¶ 43    As noted, the Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2012). Contrary to respondent's position on appeal, "the Act does not require the State to prove with specificity whether the respondent's mental disorder is 'congenital or acquired.' " *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 56.

¶ 44    As we recently explained, "the most natural reading of the statute is that a mental disorder is any condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence, whether congenital or not." *Id*. ¶ 57. We therefore concluded that the legislature did not intend that the State be required to prove the additional element of whether a mental disorder was "congenital or acquired"; rather, "it intended to provide the State with a means of protecting society from individuals, whose conditions affect their emotional or volitional

capacity in a way that predisposes them to engage in acts of sexual violence, regardless of the precise origin of those diagnosed conditions." *Id.* ¶¶ 56-58 (noting "no difference in the threat posed by an individual who is diagnosed with a congenital rather than an acquired mental disorder, or vice versa").

¶ 45    The State presented unrebutted testimony from two experts that respondent has a mental disorder as defined by the Act. See *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36 (noting that while our supreme court "has not given us guidance as to what sort of factual predicate suffices to establish the presence of a mental disorder," in order to determine whether the State has met its burden, we rely on expert testimony, and defer to the factfinder's determination as to an expert's credibility). Dr. Arroyo diagnosed respondent with other specified paraphilic disorder, sexually aroused to non-consenting persons, in a controlled environment and antisocial personality disorder. Additionally, Dr. Gaskell diagnosed respondent with other specified paraphilic disorder sexually aroused to nonconsenting females nonexclusive type, antisocial personality disorder, and substance abuse disorder.

¶ 46    Each State expert provided a clinical definition of each mental disorder and explained why he diagnosed respondent with that disorder. Both experts explained the bases of their conclusions, including their reviews of respondent's criminal, prison, and mental health records, and respondent's admissions or lack therefore in treatment. Both experts also explained how the facts of respondent's criminal offenses and his repeated refusal to admit fault supported their diagnoses. Both Dr. Arroyo and Dr. Gaskell testified that despite repeated arrests and incarceration, respondent continued a pattern of behavior that harmed others and while discussing his conduct, minimized its seriousness. Even respondent's expert acknowledged that he qualified for a

diagnosis of "other specified paraphilia" disorder, although she determined, in the exercise of her clinical judgment, not to make such a diagnosis.

¶ 47    Accordingly, taking the evidence in the light most favorable to the State, we find that a rational factfinder could find beyond a reasonable doubt that respondent suffered from 'a congenital or acquired condition affecting the emotional or volitional capacity that predisposes" him "to engage in acts of sexual violence." See 725 ILCS 207/5(b) (West 2012).

¶ 48    Respondent also challenges the sufficiency of the evidence as to the trial court's finding that he was "much more likely than not" to commit future acts of sexual violence. Respondent argues that the evidence at trial focused only on the likelihood of recidivism relative to other sex offenders rather than the likelihood that he would not reoffend. In other words, respondent argues that no evidence was presented as to his "actual likelihood of committing a new offense."

¶ 49    Pursuant to the Act, the State must establish that "[t]he person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." 725 ILCS 205/15(b)(5) (West 2012). This court has previously held that "substantially probable," as used in the Act, means "much more likely than not" that a respondent will commit acts of sexual violence due to his mental disorder. (Internal quotation marks omitted.) *Gavin*, 2019 IL App (1st) 180881, ¶ 43.

¶ 50    In the present case, both Dr. Arroyo and Dr. Gaskell testified that after performing an actuarial risk assessment and considering numerous dynamic risk and protective factors, they concluded that, because of his mental disorders, respondent was substantially probable to engage in future acts of sexual violence. Both Dr. Arroyo and Dr. Gaskell scored respondent at the above average risk of reoffending category of the Static-99R actuarial test, concluding that statistically

he was 1.94 times more likely to reoffend than an average sex offender. Dr. Arroyo also utilized the Hare Psychopathy Checklist Revised, where respondent scored at a "a moderate level of psychopathy," and fell into the "callous/conning category." Dr. Gaskell additionally utilized the Static-2002R actuarial instrument, according to which respondent's score placed him in the second highest risk category and was 2.63 times more likely than the average sex offender to commit another sexual offense. Respondent's expert, Dr. Sillitti, also competed the Static 99-R and the 2002-R and acknowledged his scores placed him in the second highest risk category.

¶ 51    Dr. Arroyo's and Dr. Gaskell's testimony also identified dynamic risk factors which exacerbated respondent's probability to reoffend, including lack of concern for others, slow progress in treatment, antisocial personality disorder, hostility, impulsiveness, recklessness, employment instability, and substance abuse. In addition, neither expert found any protective factors that mitigated respondent's risk to reoffend, as respondent was not limited in his mobility despite his age, was in the earliest stages of treatment, and struggled to take responsibility for his actions. Taking this evidence in the light most favorable to the State, we are compelled to conclude that a rational trier of fact could find beyond a reasonable doubt that respondent was substantially probable to commit future acts of sexual violence under the Act.

¶ 52    We are unpersuaded by respondent's argument that the evidence at trial was insufficient because it only established his likelihood of offending as compared to other sex offenders rather than respondent's "actual likelihood of coming a new offense." Respondent relies on no authority for his position that the State must present a "baseline" likelihood of respondent's recidivism or explain how one would be calculated, and his argument must fail.

¶ 53 Here, Dr. Arroyo and Dr. Gaskell opined that respondent qualified as a sexually violent person under the Act because, in pertinent part, he had "congenital or acquired" mental disorders that affected his emotional or volitional capacity in a way that predisposed him to acts of sexual violence, and these mental disorders created a substantial probability that he would engage in future acts of sexual violence. Taking the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have found that respondent was a sexually violent person. *Fields*, 2014 IL 115542, ¶ 20. We reverse a trial court only when the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt (*White*, 2016 IL App (1st) 151187, ¶ 56). This is not such a case. We therefore affirm the trial court's determination that respondent is a sexually violent person under the Act.

¶ 54 Accordingly, for the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 55 Affirmed.