NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240733-U

NO. 4-24-0733

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 11, 2025
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* COMMITMENT OF JAMES JAMES JR. | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Henry County |
| Petitioner-Appellee, | ) No. 20MR84 |
| v. | ) |
| James James Jr., | ) Honorable |
| Respondent-Appellant). | ) Colby G. Hathaway, |
| | ) Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's judgment.

¶ 2    In May 2020, the State filed a petition alleging respondent, James James Jr., was a sexually violent person (SVP) as defined by the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2020)) and asking the trial court for an order of commitment pursuant to section 40 of the Act (*id.* § 40). In April 2024, the court found the State proved beyond a reasonable doubt that respondent was an SVP as defined by section 5(f) of the Act (725 ILCS 207/5(f) (West 2022)) and ordered respondent to be committed to the Illinois Department of Human Services (DHS) Treatment and Detention Facility (TDF). Respondent appeals, arguing he did not have a qualifying mental disorder under the Act, the State did not prove beyond a reasonable doubt he was an SVP, and the Act was applied to him in an unconstitutional manner. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On May 26, 2020, the State filed a petition to commit respondent to a TDF because he was an SVP. The petition noted Dr. Robert Brucker Jr. diagnosed respondent with "Other Specified Personality Disorder, with Antisocial Traits," which is a congenital or acquired condition affecting respondent's emotional or volitional capacity that predisposes him to commit acts of sexual violence. The State alleged respondent was dangerous to others because one or more of his mental disorders create a substantial probability that he would engage in acts of sexual violence.

¶ 5          That same day, after reviewing the State's petition and attached exhibits and determining cause existed to believe respondent was eligible for commitment under section 35(f) of the Act (725 ILCS 207/35(f) (West 2020)), the trial court ordered respondent to be detained. On May 28, 2020, the court entered a probable cause finding and order, ordering respondent to be detained and undergo an evaluation to determine whether he was an SVP.

¶ 6          In March 2024, a bench trial was held on the State's petition to commit respondent as an SVP under the Act. The trial court heard from Dr. Brucker and Dr. Nicole Hernandez, who the parties stipulated were expert witnesses, and no other witnesses testified.

¶ 7                                    A. Testimony of Dr. Brucker

¶ 8          The State called Dr. Brucker, a licensed clinical psychologist and sex offender evaluator with a doctorate degree in clinical psychology. According to his testimony, he was familiar with the Act, first worked with sex offenders in 1995, and started working at the TDF in May 2000. Since 2011, he had performed SVP evaluations for both the Office of the Illinois Attorney General (AG's Office) and respondents. The AG's Office asked him for a second opinion as to whether respondent met the criteria for commitment as an SVP. He interviewed respondent for 4 hours and 30 minutes on April 23, 2020. This was his only interview with respondent, but he

completed multiple evaluations of respondent and reviewed documentation from the TDF facility where respondent was held. He indicated he was confident additional interviews would not have provided substantially new information.

¶ 9       Dr. Brucker testified he completed four reports in this case—dated April 29, 2020, June 29, 2021, January 29, 2022, and July 20, 2023—examining whether respondent continued to meet the definition of an SVP under the Act. He determined respondent remained an SVP. Throughout this case, he reviewed reports from other evaluators, police reports, court documents, evaluations, sex offender evaluations, disciplinary records, mental health records, medical records, and documents from the TDF (including disciplinary records, treatment records, medical records, treatment plans, and other evaluations conducted at the TDF).

¶ 10      Regarding respondent's criminal history, Dr. Brucker testified respondent was arrested for disorderly conduct at 17 and setting grass on fire when he was 18. Respondent was sentenced to a stayed 30-day term in the county jail and a 1-year term of conditional discharge. During that year, two petitions to revoke respondent's conditional discharge were filed because he was behind in paying his probation fees. On January 30, 2009, a woman reported respondent committed sexual offenses against her two-year-old daughter and three-year-old son while babysitting them. Although Dr. Brucker noted respondent had consistently denied engaging in this behavior, he was convicted in that case and sentenced to 180 days in jail and 4 years' probation.

¶ 11      Respondent was released from jail on September 16, 2009. Less than a week later, two inmates at the jail told investigators respondent had forced oral and anal sex on one of the inmates, K.H, who did not want to engage in those acts but was unable to stop respondent. The other inmate, O.G., witnessed respondent being physically aggressive toward K.H. and forcing K.H. to take part in oral and anal sex on multiple occasions. Both K.H. and O.G. indicated

respondent threatened the men with serious injury or death if they told anyone what he had done. When Dr. Brucker asked respondent about these allegations, respondent acknowledged acting aggressively toward the men and threatening them but could not remember what happened with K.H. regarding the oral and anal sex allegations. Dr. Brucker indicated respondent appeared to be ashamed or bothered by the allegations. Respondent admitted forcing K.H. to "stick a carrot up his ass" because he was bored and K.H. was someone he could pick on. After finding out O.G. provided a videotaped interview, respondent acknowledged he had K.H. perform oral sex on him and had anal sex with K.H. but claimed these were consensual acts. However, he acknowledged knowing both O.G. and K.H. were very scared of him.

¶ 12        On September 23, 2009, respondent, a registered sex offender, was found near Kewanee High School while children were present in the neighborhood and students were in the parking lot. He was transported to the Henry County Sheriff's Office. Dr. Brucker testified respondent provided inconsistent explanations for why he was near the school. He indicated he did not know he was not allowed to be near the school but also told people he thought he would only receive a warning because it was a first offense. The State charged respondent with unlawful loitering and unlawful presence in a school zone. He was convicted and sentenced to three years in prison.

¶ 13        Dr. Brucker testified respondent was released from prison in November 2011. In July 2012, he was arrested in Macomb for a sex offender registration violation. In February 2013, he was charged in Henry County for the same thing. In June 2013, the State determined it would not prosecute respondent for the alleged violation that occurred in Macomb. However, that same month, in Henry County case No. 13-CF-46, respondent was convicted of failing to register as a sex offender and sentenced to four years in the Illinois Department of Corrections (DOC) and three

- 4 -

years of mandatory supervised release.

¶ 14 This was not respondent's only arrest in Henry County in 2013. In April 2013, respondent was arrested and later charged in case No. 13-CF-126 with two counts of domestic battery and one count of aggravated battery. Dr. Brucker did not have official police reports for this incident, but another evaluator indicated respondent had been physically aggressive with someone he was dating and possibly broke or hurt her fingers. Dr. Brucker did not indicate if respondent was convicted in case No. 13-CF-126.

¶ 15 In December 2015, respondent was released from prison. Shortly thereafter, in February 2016, respondent was arrested for driving without a license or permit. Dr. Brucker did not know the outcome of that arrest.

¶ 16 Less than two years later, respondent was charged in Henry County case No. 17-CF-404 with conduct related to communicating with whom he believed to be a 15-year-old girl on social media. Initially, after respondent was told he was communicating with a 15-year-old girl, he told the "girl" he was too old to talk to her because he was 29. Dr. Brucker testified this showed respondent knew communicating with the "girl" was not appropriate, but he continued the communication. Five different times, respondent indicated either he was too old or the "girl" was too young.

¶ 17 Dr. Brucker opined respondent clearly knew the "girl's" age was an issue. Respondent told the "girl" he did not want to get in trouble with her mother. He also showed some suspicion regarding whether the "girl" was telling him the truth. On multiple occasions, respondent asked the "girl" to call him and called her "girl" and "baby girl." Respondent and the "girl" sent each other flirtatious messages. Finally, respondent asked the "girl" if she wanted to get together and then invited her to his house. When discussing what they would do, respondent mentioned the

two engaging in sexual activity. Respondent and the "girl" agreed to meet at a Casey's General Store. When respondent arrived at the store, he learned the "girl" was a police officer.

¶ 18    Respondent told other evaluators the "girl" pursued him and brought up sex and condoms, shifting the blame away from himself. When Dr. Brucker spoke with respondent, respondent acknowledged communicating with the "girl," knowing he was not supposed to be using social media, using an alias, and not thinking he would get caught. When Dr. Brucker asked respondent in various ways why he did not stop communicating with the "girl" when "she" said "she" was 15, respondent said he did not know, he was stupid, and he regretted his actions. Respondent claimed he suspected the "girl" was a police officer but did not know why he did not stop communicating with "her." Dr. Brucker testified respondent clearly knew what he was doing was wrong and inappropriate but thought he could get away with it. Respondent was convicted of indecent solicitation and violation of the sex offender registry after trying to meet the "girl." He received concurrent five-year prison terms.

¶ 19    Dr. Brucker also testified he found it relevant that respondent had sex with multiple teenage girls (who were under 17) when respondent was in his twenties. Respondent knew this was inappropriate because the girls were below the age of consent and he was an adult. In addition, respondent said he had committed 50 noncontact sex offenses that were never discovered or charged. Further, while in prison, respondent violated prison rules 66 times—although none of the violations were sexual in nature. Respondent also engaged in problematic behavior at the TDF, including trading and trafficking DVD movies with other residents at the facility. According to Dr. Brucker, he was not aware of respondent engaging in any sex offender treatment, either in the community or while in DOC.

¶ 20    As to whether respondent had any mental disorders as defined by the Act, Dr.

Brucker testified he used the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) to arrive at his diagnoses. Brucker opined respondent had one mental disorder as defined by the Act—"Other Specified Personality Disorder, with Antisocial Traits." He also diagnosed respondent with three other conditions that were not mental disorders under the Act—unspecified anxiety disorder, alcohol use disorder in a controlled environment, and intellectual disability (mild). When questioned about "Other Specified Personality Disorder, with Antisocial Traits," Dr. Brucker explained the DSM-5-TR includes a category of personality disorders, which are generally conditions that start in early to late adolescence and continue into and throughout adulthood. A person's cognition and ability to think can be impacted by a personality disorder. According to Dr. Brucker, a person with a personality disorder sees the world, interacts with the world, and perceives the world in a distorted manner. This impacts his emotions. The combined effect of the person's perceptions and emotions impacts his ability to make good decisions and impairs his ability to regulate his emotions.

¶ 21       Dr. Brucker continued by explaining one personality disorder is "antisocial personality disorder." If an individual does not meet all the criteria for antisocial personality disorder, the DSM-5-TR allows for a diagnosis of either "Other Specified Personality Disorder" or "Other Unspecified Personality Disorder." If a clinician is not certain an individual meets every element of antisocial personality disorder, the clinician can diagnose the individual with either "Other Specified" or "Other Unspecified Personality Disorder." Dr. Brucker testified he did not diagnose respondent with antisocial personality disorder because he was not certain respondent met one prong of that diagnosis. According to Dr. Brucker, he is conservative and cautious when diagnosing people. As a result, he diagnosed respondent with "Other Specified Personality Disorder, with Antisocial Traits," which is either a congenital or acquired condition that affects

respondent's emotional or volitional capacity and predisposes respondent to engage in continued acts of sexual violence.

¶ 22    Dr. Brucker testified "Other Specified Personality Disorder, with Antisocial Traits" is a mental disorder under the Act. While respondent did not have a paraphilia, the sexual components of respondent's actions were driven by respondent's belief he could do what he wants to do regardless of whether his actions hurt or violate someone else's rights. Dr. Brucker indicated respondent still had this condition, which generally does not go away. Respondent's behavior had improved at the TDF, but he was still violating the facility's rules. This showed respondent still believed he did not have to follow the rules of others. Respondent disliked authority and following rules. Even in the highly supervised TDF, respondent decided to break the facility's rules. Respondent's underlying values and beliefs, which he had demonstrated in both his childhood and adulthood, showed he violated rules, had no problems with lying to and manipulating others, and violated individual's rights in a sexual manner. Generally, according to Dr. Brucker, antisocial traits do not generally cause someone to engage in future sex offenses. However, given respondent's history, the beliefs he has, and his view of the world, respondent is predisposed to commit future acts of sexual violence. Dr. Brucker stated "the antisocial part is what drives [respondent] to violate the rights of others," which in this case is the sexual rights of others.

¶ 23    According to Dr. Brucker, a note from a group therapy session in June 2023 indicated respondent was talking about his sex offense against a 15-year-old girl. The note indicated respondent said his actions were not just about sex but also the excitement that "he was going to get over on someone." Dr. Brucker said a person with antisocial personality characteristics can receive a thrill from violating the law, harming someone, or getting away with improper conduct. Dr. Brucker noted respondent was processing through this in treatment and determining

what drives his behaviors.

¶ 24　　　　In addition, Dr. Brucker testified risk assessments showed respondent was in the highest risk category for committing a sex offense in the future. Respondent had not successfully completed a sex offender treatment program but was attending a five-stage sex offender program at the TDF. He had completed the first phase, or assessment phase, of the program and currently was in the second, or "accepting responsibility," phase of the program, where the offender talks and writes about the offense he committed. Dr. Brucker explained that in the second phase, an offender learns about "thinking errors" and "cognitive distortions," which impact the way a person thinks and tells himself he has permission to do things that should not be done. In addition, Dr. Brucker noted respondent was in a specialized sex-offense-specific group for individuals with intellectual disabilities and learning problems.

¶ 25　　　　When asked about respondent's progress in treatment, Dr. Brucker saw nothing concerning or surprising. Respondent was starting to become more open and honest about his criminal behavior and parts of his sexual offenses. He was also taking responsibility for seeking out a 15-year-old girl on social media and manipulating her with the intent of having sex, which he was not acknowledging prior to his treatment. Dr. Brucker also noted respondent had completed four or five "sex[-]offense-related groups." In addition, respondent was working to expand his knowledge about his thinking errors, healthy relationships, and healthy sexuality. However, the progress respondent had made did not serve as a protective factor at that time. During the next phase of his treatment, Dr. Brucker indicated respondent would examine why he committed the sexual offenses. Then, he would develop interventions and a relapse prevention plan.

¶ 26　　　　According to Dr. Brucker, respondent met the criteria to be found to be an SVP under the Act. He had a conviction for a sexually violent offense and suffered from a congenital

and/or acquired mental disorder that affected his emotional or volitional capacity, making it substantially probable he would engage in future acts of sexual violence.

¶ 27                                    B. Testimony of Dr. Hernandez

¶ 28         Dr. Hernandez, a sex offender evaluator with a doctorate in clinical psychology, indicated she had both interviewed and evaluated respondent. She diagnosed respondent with autism spectrum disorder and mild intellectual disability. She indicated he had functional deficits in all areas of his life.

¶ 29         According to Dr. Hernadez, respondent had an IQ of 65, functioned like a 14- or 15-year-old person in society, and was the academic equivalent of a first, second, or third grade student. Dr. Hernandez testified a person with respondent's intellect might be able to say whether something was right or wrong based on what they had been told but would be unable to make inferences from that information because they lacked abstract reasoning skills. For example, Dr. Hernandez noted respondent knew he was not supposed to be on school grounds when he was arrested. However, the doctor asserted respondent did not understand how far 500 feet was or what it meant to be close to school grounds. Dr. Hernandez believed respondent likely thought he only could not be near a school during school hours.

¶ 30         Further, Dr. Hernandez said respondent's intellectual deficits can cause him social and interpersonal problems. Respondent said he struggled socially and had difficulty understanding other individual's emotions because he did not contextually understand what was happening in certain situations. While respondent had many problematic and disruptive behaviors, Dr. Hernandez said his behavior was disorganized, as opposed to antisocial. Respondent might know doing a certain thing is wrong but not understand why.

¶ 31         According to Dr. Hernandez, neither autism nor mild intellectual disability is a

mental disorder under the Act because a predisposition toward sexual deviancy is not inherent in either condition. Further, she did not diagnose respondent with any other condition that qualified as a mental disorder under the Act and ruled out a diagnosis of "Other Specified Personality Disorder, with Antisocial Traits." According to Dr. Hernandez, when looking at respondent's patterns of behavior, evidence of potential oppositional defiant disorder might exist. However, she saw no evidence of conduct disorder or current evidence of antisocial personality traits. Dr. Hernandez told the trial court an individual with antisocial personality disorder has a complete disregard for right and wrong. Those people know and understand what is right and wrong but are so self-centered that they are willing to harm people to get what they want. According to Dr. Hernandez, unlike someone with antisocial personality disorder, respondent does not understand what he is doing is wrong.

¶ 32     In addition, Dr. Hernandez told the trial court her diagnosis of autism spectrum disorder can provide an explanation for why Dr. Brucker diagnosed respondent with "Other Specified Personality Disorder, with Antisocial Traits." According to Dr. Hernandez:

> "If you understand autism spectrum disorder and do a more thorough interview of him, you can understand that a lot of the characteristics that might look antisocial, like a lack of remorse and a lack of empathy, is explained by the autism spectrum, where there is a lack of understanding, like being able to have the connectedness to other people, being able to have perspective-taking. That is something that people with autism cannot do."

Dr. Hernandez then asserted respondent's disorganization, cluster of symptoms, and low IQ led him to perceive teenagers to be his peers. In her opinion, respondent was not receiving sexual arousal from either the teenager's inability to consent to sexual activity or from any power

differential between him and the teenagers.

¶ 33    Regarding Dr. Brucker's "Other Specified Personality Disorder, with Antisocial Traits" diagnosis, Dr. Hernandez said that condition does not generally predispose everyone who has it to engage in acts of sexual violence and is not inherently sexually deviant. According to Dr. Hernandez, the condition predisposes a person to a wide range of antisocial activities and criminal activities, but usually not sexual acts. However, she acknowledged the antisocial activities could include sexual acts. She was later asked, "Are there any of the diagnoses that Dr. Brucker made that in your understanding of them as [DSM-5-TR] diagnoses would predispose [respondent] to acts of sexual violence, assuming they were the correct diagnoses?" Dr. Hernandez responded, "The antisocial traits could. In my opinion, I wouldn't apply that diagnosis to be a qualifying disorder, though."

¶ 34    Dr. Hernandez did not find respondent had any mental disorders that affected his emotional or volitional capacity that predisposed him to commit acts of sexual violence. However, she acknowledged respondent was in a high-risk category to reoffend and needed a lot of treatment. Regardless, once again, she testified respondent did not have a mental disorder under the Act that predisposes people with that condition to engage in acts of sexual violence. When asked whether respondent could control his sexual behavior in the community, Dr. Hernandez said most of respondent's offending conduct was not sexual. However, she acknowledged he had not been in the community very much because of his behavior.

¶ 35    Although Dr. Hernandez testified respondent needed treatment, she said he did not need the treatment provided at the TDF. According to Dr. Hernandez:

> "The individuals in the TDF are either suspected to be or committed as a[n] [SVP]. And the structure of the program is designed to address deviant sexual

- 12 -

interests, sexual preoccupation, and *** the deviant urges and fantasies that come along with that. They *** have some programs that take into account other mental illness. There [is] specialized programming that is designed for lower intellectual functioning, but that programming is specific to treating paraphilic urges. [Respondent] does not have paraphilic urges. He acts out in law breaking ways because he doesn't have the conceptual understanding nor has he had the education to understand the things that he's doing and how to not to do it anymore. But it's not the program that he would receive at the TDF. Or the training he would receive."

¶ 36                              C. Trial Court's Ruling

¶ 37          After considering the parties' respective written closing arguments, the trial court issued its ruling on April 5, 2024, noting respondent conceded he had been convicted of a sexually violent offense. As for whether respondent had a mental disorder as defined by the Act, the court found Dr. Brucker's testimony more credible than that of Dr. Hernandez. According to the court, Dr. Hernandez's opinion respondent lacked both the ability to understand right from wrong and the consequences of his actions was contradicted by the record. Based on the evidence presented, the court found respondent understood right from wrong and chose to disregard the law and the rights of others for his own purposes because of the mental condition diagnosed by Dr. Brucker. Specifically, the court stated respondent "has a clear pattern here of putting his wants above the law, above the rights of others, and imposing his will despite knowing the consequences, and I think that fits squarely with the diagnosis that Dr. Brucker testified to." Therefore, the court found the State had established respondent had a mental disorder as defined by the Act. The court also found the State proved it was substantially probable respondent would engage in further sexual

violence, noting the risk assessments and other evidence.

¶ 38     Based on all the evidence, the trial court found respondent was dangerous because a mental disorder from which he suffered made it substantially probable that he would engage in additional acts of sexual violence. The court denied respondent's claim the Act had been unconstitutionally applied to him and committed respondent to the custody of DHS for control, care, and treatment until such time as he is no longer an SVP.

¶ 39     This appeal followed.

¶ 40                                II. ANALYSIS

¶ 41     On appeal, respondent argues "Other Specified Personality Disorder, with Antisocial Traits" does not qualify as a mental disorder under the Act, the State did not establish he was an SVP beyond a reasonable doubt, and the Act is unconstitutional as it was applied to him.

¶ 42                         A. Qualifying Mental Disorder

¶ 43     Respondent's first argument is the trial court erred in classifying him as an SVP under the Act because the State did not establish he had a qualifying mental disorder. Section 5(f) of the Act (725 ILCS 207/5(f) (West 2022)) defines an SVP as "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence."

¶ 44     Dr. Brucker and Dr. Hernandez provided the trial court with contradictory expert testimony on the question of whether respondent had a mental disorder as defined by the Act. Dr. Brucker, the State's expert witness, testified he diagnosed respondent with "Other Specified Personality Disorder, with Antisocial Traits," which he said was a mental disorder under the Act. However, Dr. Hernandez, respondent's expert witness, testified respondent did not have "Other Specified Personality Disorder, with Antisocial Traits." Further, Dr. Hernandez asserted "Other

Specified Personality Disorder, with Antisocial Traits" does not generally predispose everyone with the condition to engage in acts of sexual violence, it is "not inherently *** sexually deviant," and it is not a mental disorder under the Act. However, she did acknowledge the disorder sometimes could affect a person's emotional or volitional capacity and could predispose a person to commit sexual acts.

¶ 45 According to the Act, " 'Mental disorder' means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes *a person* to engage in acts of sexual violence." (Emphasis added.) 725 ILCS 207/5(b) (West 2022). According to respondent, because the legislature chose to use the indefinite article "a" before "person" when defining "mental disorder," the legislature meant that a mental disorder under the Act has to predispose everyone who has it to sexual violence.

¶ 46 Respondent's argument presents a question of statutory construction, which we review *de novo*. *Accettura v. Vacationland, Inc.*, 2019 IL 124285, ¶ 11. We first note respondent is correct that this court should not overlook or discount the legislature's decision to use a definite or indefinite article when interpreting a statute. See *People v. Hayden*, 2018 IL App (4th) 160035, ¶ 122 ("Like all the other words in a statute, the articles count."). However, we find no merit in respondent's argument the legislature intended to limit what constitutes a "mental disorder" under the Act to a congenital or acquired condition that predisposes every person with that condition to engage in acts of sexual violence. Respondent's reliance on the legislature's use of the indefinite article "a" before the noun "person" in the Act's definition of "mental disorder" is misplaced.

¶ 47 "[A] principle of statutory construction is that 'the definite article "the" particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of "a" or "an." ' " (Emphasis omitted.) *Sibenaller v. Milschewski*, 379 Ill.

- 15 -

App. 3d 717, 722 (2008) (quoting *Brooks v. Zabka*, 450 P. 2d 644, 655 (1969)). "An indefinite article points to a non-specific object, thing, or person that is not distinguished from the other members of a class. The thing may be singular {a student at Princeton}, or uncountable {a multitude}, or generalized {an idea inspired by Milton's *Paradise Lost*}." Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 106 (The University of Chicago Press 2016) (ebook).

¶ 48        Based on our review of the plain language the legislature used to define "mental disorder," we reject respondent's interpretation of the legislature's intent. Considering the plain language of the statute, a "mental disorder" under the Act is a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person with that condition—not every person with that condition—to engage in acts of sexual violence. We need not address this issue further.

¶ 49                          B. Sufficiency of the Evidence

¶ 50        We next turn to respondent's argument the State failed to present sufficient evidence to prove he was an SVP.

> "To establish that respondent was an SVP, the State had to prove beyond a reasonable doubt that (1) respondent was convicted of a sexually violent offense; (2) he has a mental disorder; and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20.

Respondent conceded he had been convicted of a sexually violent offense. However, he argues the State did not prove beyond a reasonable doubt he had a mental disorder as defined by the Act.

¶ 51    When reviewing a challenge to the sufficiency of the evidence in a case, we determine whether any rational trier of fact could have found the State proved the elements of the offense beyond a reasonable doubt when the evidence is viewed in a light most favorable to the State. *Id.* This court will not reverse the trier of fact's determination unless the evidence before the trier of fact is so unsatisfactory or improbable that reasonable doubt exists. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56. "It is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence." *Id.*

¶ 52    As noted above, Dr. Brucker testified respondent had "Other Specified Personality Disorder, with Antisocial Traits," which he said was a mental disorder under the Act and predisposed respondent to commit acts of sexual violence. However, Dr. Hernandez contradicted Dr. Brucker's diagnosis. According to Dr. Hernandez, respondent did not have "Other Specified Personality Disorder, with Antisocial Traits." Instead, Dr. Hernandez asserted respondent had autism spectrum disorder and mild intellectual disability.

¶ 53    As a result, the trial court had contradictory information from the two expert witnesses in this case. Therefore, according to respondent, the court did not have proof beyond a reasonable doubt that respondent was an SVP. Respondent conceded a trial court can find one expert witness more credible than another and adopt his or her opinion under a lower standard of proof, but he argues it cannot do so when the burden is proof beyond a reasonable doubt and the State neither impeached nor impugned the character of the respondent's expert witness. However, according to the First District in *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36, "The Illinois Supreme Court has not given us guidance as to what sort of factual predicate suffices to

establish the presence of a mental disorder. Instead, it has relied heavily on expert testimony, deferring to the factfinder on expert credibility."

¶ 54    Unlike this court, the trial court was able to view the testimony of both experts in this case and determine whose opinion it found more credible. When explaining its ruling, the court found Dr. Hernandez's testimony less credible than Dr. Brucker's testimony. The court noted Dr. Hernandez opined respondent lacked the ability to understand right and wrong and to appreciate the consequences of his actions. However, the court found Dr. Hernandez's conclusions were contradicted by the record. According to the court, the evidence established respondent understood the difference between right and wrong and chose to disregard the law and the rights of others to achieve his goals because of his mental condition.

¶ 55    Based on the record in this case, we will not disturb the trial court's determination Dr. Brucker's expert testimony was more credible than Dr. Hernandez's testimony. "It is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence." *White*, 2016 IL App (1st) 151187, ¶ 56. As a result, respondent's argument regarding the sufficiency of the evidence fails. A rational trier of fact could have reasonably concluded respondent was an SVP based on the evidence presented.

¶ 56    C. As-Applied Constitutional Challenge

¶ 57    We next turn to respondent's argument the Act was unconstitutionally applied to him. We initially note a statute is presumed to be constitutional. *People v. Wilson*, 214 Ill. 2d 394, 398 (2005). The party challenging the constitutional validity of a statute bears the burden of rebutting the presumption of constitutionality. *Id.* at 399. "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the

challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. Respondent's argument on this issue appears built on the premise the trial court erred in finding Dr. Brucker was more credible than Dr. Hernandez. As we have already ruled, we will not disturb the trial court's credibility determination.

¶ 58 The United States Supreme Court has upheld civil commitment statutes if the statutes require proof of both an individual's future dangerousness and mental illness or abnormality. *Kansas v. Hendricks*, 521 U. S. 346, 358 (1997). The Illinois Supreme Court has stated that "due process permits an individual to be held as long as he or she is both mentally ill and dangerous" (*In re Detention of Stanbridge*, 2012 IL 112337, ¶ 85). In this case, the trial court agreed with Dr. Brucker's opinion that respondent was dangerous because he has a mental disorder that makes it substantially probable that he will engage in acts of sexual violence.

¶ 59 However, respondent argues he cannot be cured, so he will be confined for the rest of his life. Therefore, the Act is unconstitutional when applied to his situation. Respondent points to section 40(a) of the Act (725 ILCS 207/40(a) (West 2022)), which states:

> "If a court or jury determines that the person who is the subject of a petition under Section 15 of this Act is [an SVP], the court shall order the person to be committed to the custody of [DHS] for control, care and treatment until such time as the person is no longer [an SVP]."

¶ 60 We need not address whether the Act would be unconstitutional as applied if an SVP clearly stood no chance of ever being released because the evidence does not indicate respondent is in that situation. According to Dr. Brucker's testimony, respondent was making progress toward his rehabilitation at the TDF. He was attending a five-stage treatment program for sex offenders, had completed the first stage of the program, and was currently going through the

second stage, where he was learning to accept responsibility for his conduct. In addition, Dr. Brucker testified respondent was in a specialized sex-offense-specific group for individuals with intellectual disabilities and learning problems.

¶ 61 Dr. Brucker was neither concerned nor surprised about anything involving respondent's treatment. Respondent was working to expand his knowledge regarding his thinking errors, healthy relationships, and healthy sexuality. Additionally, respondent was also becoming more open and honest about his criminal behavior and parts of his sexual offenses.

¶ 62 Based on our review of respondent's arguments on this issue and the record, respondent has failed to establish the Act is being applied to him in an unconstitutional manner.

¶ 63 III. CONCLUSION

¶ 64 For the reasons stated, we affirm the trial court's judgment in this case.

¶ 65 Affirmed.